Reverend Thomas B. ALLEN et al.,
Appellants,

v.

Walter HICKEL, Secretary of the
Interior, et al.

No. 23544.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 12, 1969.

Decided April 10, 1970.

Mr. Warren K. Kaplan, with whom Messrs. Ralph J. Temple and Lawrence Speiser, Washington, D. C., were on the brief, for appellants.

Mr. Gil Zimmerman, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Joseph M. Hannon, Asst. U. S. Attys., were on the brief, for appellees.

Mr. Joel H. Levy, Washington, D. C., filed a brief on behalf of The American Jewish Congress, as amicus curiae.

Before TAMM, LEVENTHAL and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

On December 15, 1969, the President, following a tradition established in 1923 by President Harding, threw a switch lighting the National Christmas Tree. The tree was located in the Ellipse (an elliptically shaped park across the street from the White House). Nearby were 57 other lighted and decorated Christmas trees representing the 50 states and seven of the territories of the United States. Also present were reindeer, a burning Yule log, and the center of the controversy before us: an illuminated life-size crèche, or Nativity scene, depicting the birth of Christ attended by his mother Mary, St. Joseph, shepherds, animals, and the three Magi. The National Christmas tree and all the rest of these items, together with singing, instrumental concerts, and other seasonal observances, formed the 1969 presentation of the annual Christmas Pageant of Peace. The Pageant is an event co-sponsored by the National Park Service and a non-profit corporation called Christmas Pageant of Peace, Inc. A prime purpose of the Pageant is to proclaim the message of "peace on earth to men of good will."

The plaintiffs, now appellants, in this case are an Episcopalian minister, a Catholic priest, a rabbi, the president of the American Ethical Union, and an officer of the National Humanist Association. Plaintiffs' complaint objected to the inclusion of the crèche in the Pageant of Peace celebration as a violation of the Establishment and Free Exercise

clauses of the First Amendment to the Constitution. They sought an injunction in the District Court against construction and maintenance of the crèche on federal park land. On September 30, 1969, the District Court, after hearing oral argument, granted appellees' motion to dismiss on the ground that appellants lacked standing, and alternatively granted appellees' motion for summary judgment, denied appellants' motion for preliminary injunction, and dismissed the action. On December 12, 1969, this court, without opinion, denied appellants' motion for injunction pending the outcome of this litigation.

Two substantial issues are presented by appellants' suit: whether or not they have standing to sue for the relief they have requested; and whether or not the construction and maintenance of the crèche on federal park lands violates the Establishment and Free Exercise clauses.

### I. Standing

Appellants assert that they have standing to sue because of their status as taxpayers, citing Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). *Flast* states the standard for taxpayer standing in the following way:

> [I]n ruling on standing, it is both appropriate and necessary to look to the substantive issues for another purpose, namely, to determine whether there is a logical nexus between the status asserted and the claims sought to be adjudicated. * * *
>
> The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. * * * Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. [392 U.S. at 102, 88 S.Ct. at 1953]

Uncontradicted affidavits for the appellees state that no Government funds are expended in the construction, maintenance, disassembly, or storage of the crèche. Appellants argue, however, that the general funds which support the Christmas Pageant of Peace must be considered as expended partially for the crèche. They argue, in effect, that this court should retrospectively allocate among the Christmas trees, the Yule log, the reindeer, and the crèche those funds which were spent for extra police personnel, debris collection, and other services. We need not reach a determination of that argument in the present case, however, since we conclude that plaintiffs have standing to raise the crèche issue in the federal courts apart from the expenditures of public funds entailed.

The Supreme Court has recently made clear that standing to present claims founded on the Constitution, or Federal statutes, may stem from non-economic values as well as economic values. *See* Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed. 2d 184 (March 3, 1970), citing Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 616 (2d Cir. 1965); Office of Communication of United Church of Christ v. FCC, 123 U.S.App. D.C. 328, 335–340, 359 F.2d 994, 1001– 1006 (1968). The Court made it particularly clear that there is a readiness to find standing conferred by non-economic values in order to consider issues concerning the Establishment Clause and the Free Exercise Clause.[1]

 In the present case we conclude that the issues under the Free Exercise and Establishment Clauses are presented by plaintiffs who have standing, who present an injury, in the impairment of non-economic values, giving them a "personal stake in the outcome

---

1. "A person or a family may have a spiritual stake in First Amendment values sufficient to give him standing to raise issues concerning the Establishment Clause and the Free Exercise Clause." *Camp, supra,* 397 U.S. at 154, 90 S.Ct. at 830.

of the controversy,"[2] as contrasted with mere airing of "generalized grievances about the conduct of the government."[3] An aspect of the case that underscores the standing of the plaintiffs is their allegation that the defendants are proposing to devote Government park property to uses inconsistent with the Free Exercise and Establishment Clauses. Park lands are dedicated to public use and enjoyment.[4]

Plaintiffs are all residents of the metropolitan area of the District of Columbia served by park lands in the District. And in a broader sense the Ellipse park serves all citizens of the nation who come to the Nation's Capital not merely to present grievances but also, and indeed more typically, to visit its sites and monuments as one means of maintaining and strengthening their ties with the nation's values and heritage. Citizens may sue to enjoin a government holding land in trust as a park from impermissibly diverting the use so as to destroy their beneficial interests as park uses.[5] They likewise have standing to complain when the park lands are impermissibly devoted to uses that contravene the Establishment Clause.

 Since a claim under the Establishment Clause does not require a showing that plaintiffs' religious freedom is infringed, a claim that park land which plaintiff has a beneficial right be maintained for public purposes is being devoted to the use of an established religion is sufficient personal involvement to provide standing. School District of Abington Township v. Schempp, 374 U.S. 203, 224, 83 S.Ct. 1560, 10 L. Ed.2d 844 (1963).

The standing issue was perhaps clarified, in terms of perspective, when Government counsel put it at argument that if the plaintiffs didn't like to look at the crèche, they could avoid walking near the Ellipse while it was occupied by the crèche.[6] Plaintiffs were entitled, as members of the public, to enjoy the park land and its devotion to permissible public use; a government action cannot infringe that right or require them to give it up without access to the court to complain that the action is unconstitutional.[7]

## II. The Establishment of Religion Issue

### A. *The Purpose of the Crèche*

 The Government does not contend the Establishment Clause is rendered inapplicable by reason of the fact that the crèche is supplied, erected,

2. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

3. Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 1956, 20 L.Ed.2d 947 (1968).

4. Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

5. Archbold v. McLaughlin, 181 F.Supp. 175 (D.D.C.1960), and cases cited.

6. *Compare* the decision of a three-judge district court in Lemon v. Kurtzman, 310 F.Supp. 35 (E.D.Pa.1969), according standing to, inter alia, plaintiffs alleging a refusal to pay admissions tax because part of the state's general revenues were devoted to support for private and religious schools guilty of racial discrimination. "Plaintiffs allege that they have not paid an admission fee to a Pennsylvania race track because to do so would require them to pay tax for the support of religion in violation of their rights of conscience. The personal right to freedom of conscience is protected by the free exercise clause of the First Amendment and the State may not condition other rights or privileges upon the sacrifice of this freedom."

7. The televising of the tree-lighting ceremony adds to the pervasiveness of the intrusion that the crèche is argued to make upon the appellants' sensibilities on freedom from alleged religious promotion by the Government.

 The plaintiff who is a Catholic priest also objects to the crèche on the ground that the presentation of a profoundly religious theme in the secular setting that surrounds the Pageant of Peace is offensive and sacrilegious. Whatever the merits of the contention, we see no basis for denying to a citizen the right to question, through orderly court procedures, alleged Government sacrilege of the symbols of his religion.

maintained, and stored at the expense of a private organization. That position would be difficult to maintain in view of the applicable policy of the Park Service [8] which allows construction on public park land by private groups only in connection with events sponsored by the National Park Service. Such sponsorship, supplying as it does the only means by which a display may legally be erected and maintained, constitutes a Government activity.[9] We must therefore consider whether the activity contravenes the scope of the First Amendment.

█ The Government contends that the use of the crèche objected to by the plaintiffs is wholly secular, and therefore avoids any entanglement with the First Amendment. That surely overstates the matter. The crèche is not wholly secular. On the contrary, as set forth in the official pamphlet of the Christmas Pageant of Peace:[10] "The *spiritual* meaning of Christmas is offered in the form of a life-sized Nativity Scene * * *" (emphasis added). But the First Amendment does not require the Government to ignore the existence of certain beliefs and customs on the part of large numbers of its citizens. In Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952), the Court, per Justice Douglas, noted: "We are a religious people * * *" As Justice Brennan stated in his concurring opinion in School District of Abington Township, Pa. v. Schempp, *supra*, 374 U.S. at 295, 83 S.Ct. at 1611, "Nothing in the Constitution compels the organs of government to be blind to what everyone else perceives—that religious differences among Americans have important and pervasive implications for our society."

█ The applicable rule may fairly be stated thus: The Government may depict objects with spiritual content, but it may not promote or give its stamp of approval to such spiritual content. Illustrative of this principle, and the difficulty of applying it, is the recent case of Lowe v. City of Eugene, Or., 459 P. 2d 222 (1969), vacating Or., 451 P.2d 117 (1969). There the Supreme Court of Oregon eventually concluded that the construction of a permanent Latin cross on park property in Eugene, Oregon, constituted a violation of the Establishment Clause. The court held that the permanent display was more than the depiction of a symbol representing the beliefs of certain members of the community, but represented the promotion or approval of those beliefs: It was not related to any secular celebration or commemoration; it was not put into any secular perspective by the presence of other symbols; and its secular purpose was not confirmed by any explanatory material.

█ The crèche in the Ellipse differs in all these respects: It was related to the celebration of a holiday season that has a clearly secular half;[11] the visual demonstration as a whole included definitely secular symbols of the secular holiday—reindeer, the Yule log, the Christmas trees; and its secular purpose was announced, at least in 1968,[12]

---

8. This policy was formulated in response to our opinion in Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F. 2d 597 (August 1, 1969), where this court ruled that the Park Service could not deny a permit for construction of an antiwar display to a private organization unless, upon trial of the issues, it appeared that the Park Service had or could formulate a rational set of rules governing the use of park lands by private organizations.

9. It also appears that several of the directors of Christmas Pageant of Peace, Inc., are high Government officials.

10. The quotation is from the 1968 pamphlet, which is in the record. This action was brought prior to the 1969 Pageant, but there is no reason suggested by any of the parties to conclude that the purpose of the Pageant had changed.

11. This fact was discussed in Women Strike for Peace, *supra*, 137 U.S.App. D.C. at 35, 420 F.2d at 603.

12. *See* note 10 *supra*.

by the official Pageant of Peace pamphlet quoted more briefly above:

> The spiritual meaning of Christmas is offered in the form of a life-sized Nativity Scene which is flood-lighted at night. The festive, happy meaning of Christmas is represented by eight reindeer who normally live at the Washington Zoological Park. They make their annual trip to the corral near the brilliantly lighted tree to give the children a close look at Santa's reindeer. And the traditional Yule Log burns day and night throughout the Pageant, offering warmth to those taking part in the Pageant festivities.

This language as to purpose of the Pageant sets forth that the crèche was intended to be simply one of a group of objects assembled to show how the American people celebrate the holiday season surrounding Christmas. As such its purpose is no more objectionable than that of a postage stamp bearing a reproduction of a religious painting or a Government-sponsored museum display illustrating various religious or holiday customs.

### B. *The Effect of the Crèche*

■ It is not only the purpose but also the effect of the crèche that must be considered. *See* School District of Abington Township v. Schempp, *supra,* 374 U.S. at 222, 83 S.Ct. at 1571. "The test may be stated as follows: What are the purpose and the primary effect of the enactments? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution."

However, our inquiry into the effect of the crèche is hampered by the fact that there has been no trial to provide an opportunity for airing this question. The disposition in the District Court was on motions for dismissal and for summary judgment.

Plaintiffs submit that the placement and size of the crèche (described as "life-sized") give it a significant religious impact even assuming the kind of secular purpose claimed by the defendants. This is underscored, they say, by the national television coverage of the scene portrayed throughout the land at the time of the tree-lighting ceremonies. The danger to be apprehended is that it will appear to the public, those on the scene and those seeing it second-hand, that the Government has given a stamp of approval to the religious content of the Nativity scene, and that this effect will not be limited by the secular purpose stated in the pamphlets which are available to a smaller group and examined by a group still smaller.

The duty of the courts is to strike the proper balance. The area is a sensitive one, involving questions of degree. The question is not whether there is any religious effect at all, but rather whether that effect, if present, is substantial. Obviously, brief references to the Deity in courtroom ceremony, in oaths of office taken by public officials, and on coins of the realm are modest in impact —it may be more accurate to say that they usually go unnoticed altogether.

■ Whatever our own personal impressions as residents of the area we cannot say as a court, on the record before us and in the absence of evidence, that it is conclusive beyond dispute that the visual impact of the crèche does not entail substantial religious impact. Nor can we say that whatever religious impact exists is an inescapable corollary of the secular purpose. We cannot on this record say that it is impossible to present the crèche and other holiday symbols in a manner designed to obviate or at least minimize offense to the sensibilities of citizens who are offended either because they are of different religions (or none), or because they are devoutly Christian and believe that the presentation of profoundly spiritual matter in a light-hearted manner and on Government property amounts to "profanation" that renders unto Caesar some of what is the Lord's. Perhaps an appropriate accompanying plaque, rather than a mere explanation in pamphlets with lesser circulation, might

serve both to allay the impression of Government sponsorship of religious belief and to set the proper respectful tone in the representation of spiritual customs.

We imply no present judgment on these matters, but we think that the issues are substantial enough to require attentive examination by the Park Service and by the District Court in the context of a presentation of pertinent evidence.

### III. Mootness

■■■ The problem which we consider here is a recurrent one. The pro-

gram has been in effect for many years, and there is every indication that it will continue unless court action forbids. The case is thus not moot. Women Strike for Peace v. Hickel, 420 F.2d at 604 (August 1, 1969); Friend v. United States, 128 U.S.App.D.C. 323, 325, 388 F.2d 579, 581 (1967), and cases cited.

We vacate the judgment entered for defendants and remand to the District Court for an evidentiary hearing and a determination of the effect of the crèche under the *Schempp* standard.[13]

So ordered.

---

13. The District Court may determine that conditional relief is appropriate, *i. e.*, that if there is substance to appellants' complaints, they may be met by modification or supplement to the display rather than its removal. To avoid misunderstanding we note that while this opinion accepts the secular purpose put forward in the pamphlet, as reasonable on its face and not contravened by other evidence, plaintiffs are of course not barred from pursuing the issue of purpose on the remand.