**Reverend Thomas B. ALLEN et al., Plaintiffs,**

**v.**

**Rogers C. B. MORTON et al., Defendants.**

**Civ. A. No. 1951–69.**

United States District Court, District of Columbia.

Nov. 3, 1971.

Warren K. Kaplan, Washington, D. C., for plaintiffs.

Gil Zimmerman, Asst. U. S. Atty., Washington, D. C., for defendants.

MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This suit, brought in 1969 by an Episcopal minister, an atheist, the president of the American Ethical Union, a rabbi, and a Roman Catholic priest, sought to

enjoin construction and maintenance of the creche in the Christmas Pageant of Peace celebration as a violation of the Establishment and Free Exercise Clauses of the Constitution. The Christmas Pageant of Peace is held annually on federal park land. The defendants are the Secretary of the Interior, the Regional Director of the National Park Service and the Superintendent of National Capital Park Central. After oral argument, this Court granted defendants' motion to dismiss for lack of standing and, alternately, granted defendants' motion for summary judgment. Subsequently, the United States Court of Appeals for the District of Columbia Circuit denied a motion for summary reversal and on April 10, 1970, after concluding that plaintiffs had standing to seek redress for injury to non-economic values, remanded the matter to the District Court "for an evidentiary hearing and a determination of the effect of the crèche under the *Schempp* standard." Allen v. Hickel, 138 U.S. App.D.C. 31, 37, 424 F.2d 944, 950 (1970).

At the same time, the Court of Appeals suggested: "Perhaps an appropriate accompanying plaque, rather than a mere explanation in pamphlets with lesser circulation, might serve both to allay the impression of Government sponsorship of religious belief and to set the proper respectful tone in the representation of spiritual customs." *Id.* at 36–37, 424 F.2d at 949–950. In a supplementary footnote, which further explained its thinking, the Circuit Court stated that "The District Court may determine that conditional relief is appropriate, *i. e.* that if there is substance to [plaintiffs'] complaints, they may be met by modification or supplement to the display rather than its removal." *Id.* at 37, 424 F. 2d at 950. Acting on the suggestion referred to, the National Park Service, prior to the 1970 Pageant, erected three plaques in appropriate places explaining the secular history and nature of the Pageant.

Pursuant to the remand, this Court held a five-day evidentiary hearing on the issues raised by the complaint. Subsequently, lengthy post-trial memoranda were submitted and have been considered by the Court.

### The Christmas Pageant of Peace

The Christmas Pageant of Peace ("Pageant") is an annual event initiated in 1954 commemorating the secular recognition of Christmas as a national holiday. It takes place on the Ellipse area, which is immediately south of the White House, during the period from about December 10 to the following January 3. Currently, it is co-sponsored by the National Park Service and by the Christmas Pageant of Peace, Inc., a non-sectarian, non-partisan civic organization organized and promoted by the Washington Board of Trade.

The Pageant consists of a number of displays, artistically arranged and presented, traditionally associated with the celebration of Christmas. One such display is the very large National Christmas Tree donated each year by a different State of the Union and lighted with the assistance of the General Electric Company. Fifty-seven smaller trees, representing fifty states and seven territories, line the "Pathway to Peace" leading up to the National Christmas Tree. In addition, there is a burning Yule Log, a pen of eight live reindeer borrowed from the National Zoological Park, and the illuminated life size creche, which is the subject of the present litigation. There is also an illuminated stage where many musical and ceremonial programs traditionally associated with Christmas take place during the three-week period of the Pageant.

It should be pointed out that plaintiffs have not directly attacked the Pageant as a whole, which commemorates Christmas, the date Christianity has recognized as the day of Christ's birth. Nor have they challenged the Pageant's inclusion of decorated Christmas trees, the reindeer and the Yule Log, Christmas symbols which have long been traditionally associated with Christianity's celebration of Christmas. Instead, they

have focused their attack upon a single aspect of the entire Christmas display which the Pageant has included as part of its secular commemoration of Christmas—a creche scene depicting the birth of Christ in the manger at Bethelem. The problem presented to the Court is whether the construction, display and maintenance of the creche, in the context just described, is a violation of the First Amendment.

### The Applicable Test

■ The standard to be applied, as was pointed out by the Court of Appeals in Allen v. Hickel, is the two-fold test enunciated in Abington School District v. Schempp, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963);

"The test may be stated as follows: what are the *purpose* and the *primary effect* of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." (emphasis supplied)

More recently, in Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), the Supreme Court, considering the possible limits of governmental involvement with religion, added a possible third test. In this case, which held that property tax exemptions to churches do not violate the Establishment Clause or the First Amendment, the Court speaking through Chief Justice Burger, stated at page 674, 90 S.Ct. at page 1414:

"We must also be sure that the end result—the effect—is not an excessive government entanglement with religion. The test is inescapably one of degree." [1]

In applying the three criteria previously set forth, two other considerations should be borne in mind. One has to do with the admittedly secular aspect of Christmas celebration which the Court of Appeals referred to in Women Strike for Peace v. Hickel, 137 U.S.App. D.C. 29, 35, 420 F.2d 597, 602–603 (1969) in the following language:

"It seems fitting and proper to use the Capital or national parks for observance of a national legal holiday, for Christmas no less than the Fourth of July with its fireworks (and speeches). Moreover, and significantly, this is a national holiday that our country shares with others. The * * * program [has] provided, in addition to music and ceremonial amenities, a climax in the form of the President's Christmas Greeting to the World.

"* * * Government counsel put it at argument that Christmas is no longer a purely religious holiday, that it has also become a secular holiday. In a way it has, and it is commonplace for non-Christians in the United States to exchange gifts and greetings in this season."

■■ The other consideration is the truism expressed by the Court of Appeals in its remand that "the First Amendment does not require the Government to ignore the existence of cer-

---

[1]. The same concept was expressed in two recent decisions. In Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Court in sustaining the constitutionality of provisions of the Federal Higher Education Facilities Act of 1963, which permitted substantial federal construction grants to church-related colleges and universities, found there was no excessive entangle-ment with religion. In Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which concerned a Pennsylvania statute which authorized purchase of specified secular educational services from church-connected schools, the Court found that the statute was unconstitutional because it involved excessive entanglement between government and religion.

tain beliefs and customs on the part of large numbers of its citizens." 138 U. S.App.D.C. 31, 35, 424 F.2d 944, 948 (1970). Any other conclusion would be fraught with difficulties, legal as well as practical. As the Supreme Court said in Abington School District v. Schempp, *supra,* 374 U.S. at 212–213, 83 S.Ct. at 1566:

"It is true that religion has been closely identified with our history and government. As we said in Engel v. Vitale, 370 U.S. 421, 434 [82 S.Ct. 1261, 8 L.Ed.2d 601] (1962), 'The history of man is inseparable from the history of religion.' * * * In Zorach v. Clauson, 343 U.S. 306, 313 [72 S.Ct. 679, 96 L.Ed. 954] (1952), we gave specific recognition to the proposition that '[w]e are a religious people whose institutions presuppose a Supreme Being.' The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself. * * * It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people. * * *." 2

In Allen v. Hickel, the Court of Appeals stated the applicable rule as follows: "The Government may depict objects with a spiritual content, but it may not promote or give its stamp of approval to such spiritual content." 138 U.S. App.D.C. at 35, 424 F.2d at 948.

We now consider whether display of the creche in the context of the facts herein presented violated the Establishment Clause of the First Amendment.

*The Purpose of the Creche*

The Court of Appeals adverted to the secular purpose of the Pageant as announced in the official Pageant of Peace Program in 1968 and concluded: "As such its purpose is no more objectionable than that of a postage stamp bearing a reproduction of a religious painting 3 or a Government-sponsored museum display illustrating various religious or holiday customs." 138 U.S.App.D.C. at 36, 424 F.2d at 949. The Court of Appeals was careful to note that, while the Court accepted the secular purpose announced in the pamphlet as reasonable on its face and not contravened by other evidence, the plaintiffs were "not barred from pursuing the issue of purpose on the remand." *Id.* at 37, 424 F.2d at 950.

To this end plaintiffs presented evidence, much of it documentary, concerning particularly the early history of the Pageant beginning in 1954. There is no question that the support of Christian religious leaders of the community was earnestly solicited and that the participation of such clergymen, both in the planning of the Pageant itself and in supplying the so-called "ceremonial amenities" attached to certain of the individual programs comprising the Pageant, was readily obtained. However, it is clear to the Court on the full record that the participation of Christian religious leaders with their obvious and freely expressed religious motivation has always played a minor part in the presentation of the Pageant itself and, more important, has had little if anything to do with the original concept and purpose of this event.

Plaintiffs also presented evidence from the past record of certain statements made by officials of the National Park Service and others concerning the

2. The Supreme Court also pointed out in *Schempp* that, despite the identification of religion with our history and government, the tradition of religious freedom is just as strongly imbedded in our public and private life. 374 U.S. at 214, 83 S.Ct. 1560.

3. The Court may have had reference to Protestants and Other Americans United v. O'Brien, D.C., 272 F.Supp. 712 (1967), reversed on other grounds, Protestants and Other Americans United v. Watson, 132 U.S.App.D.C. 329, 407 F.2d 1264 (1968).

religious and, particularly the Christian, orientation of Pageant programs and exhibits. Since this is a Pageant celebrating Christmas and since it was felt desirable to obtain the support of religious leaders of the community, it is not surprising that some attention was paid to the religious aspects of the entire program. The same can be said of remarks attributed to political officials, including at least one President of the United States on the occasion of the National Christmas Tree lighting ceremony. These isolated instances occurring over a period of seventeen years fall short of proving a basic religious purpose.

On the contrary, the basic purpose of the Pageant, however clothed, has always been admittedly secular. It was to provide a colorful event during the Christmas season which would attract visitors to Washington and thereby increase the business of local merchants. This is shown in the memorandum of December 29, 1953, from Edward Kirby to Clarence Arata, both of whom are still Vice-President and Secretary, respectively, of the Christmas Pageant of Peace, Inc. In describing the objective of the proposed Pageant, the memorandum states in pertinent part:

"The purpose of this or any other campaign, of course, is to increase the dollar volume of business and employment in the metropolitan area and to enhance the reputation of Washington as a tourist and convention center."

This purpose was further admitted by Edward R. Carr, the President and co-founder of the Christmas Pageant of Peace, Inc. In a deposition taken during this litigation, Mr. Carr was queried and responded as follows:

"Q. In your opinion have the original objective and purposes of the corporation remained the same since its beginning?

"A. Yes, I think so. I must say the main emphasis, this may sound a little crass, but the main emphasis on the particular event was to promote more business for Washington in a very dull season. That may sound a little crass, but that is the real reason behind it."

To this end, the Washington Board of Trade's Greater National Capital Committee (now known as the Washington Convention and Visitors Bureau) organized the corporation known as "Christmas Pageant of Peace, Inc." on December 7, 1954. Of the seven original incorporators, six were individuals prominently identified with the Washington Board of Trade. The seventh, Walter J. Kelly, was Superintendent of the National Park Service.

On the subject of the purpose of the Pageant, it is to be noted that plaintiffs, in the alternative, claim that the inclusion of the creche in the Pageant "represents nothing more than a profanation of a sacred religious symbol, insofar as the Pageant seeks to utilize the creche for a secular/commercial purpose." Plaintiff's Post-Trial Memorandum of Law at 13–14. Aside from the inconsistency between such position and plaintiffs' main thrust that the creche on public park land violates the Establishment Clause, the argument of profanation would appear virtually to concede the secular purpose of the Pageant as a whole and of the creche display under such circumstances.

### The Effect of the Creche

Under the two-pronged standard of *Schempp*, not only the purpose but the primary effect of the creche must be considered. As the Court of Appeals indicated, the problem is whether the viewing public will feel that the Government has given a stamp of approval to the religious content of the Nativity scene, despite the secular purpose of the Pageant as a whole which is stated in the pamphlets and which underlies the entire presentation. In this connection, the Court summed up as follows:

"The duty of the courts is to strike a proper balance. The area is a sensitive one, involving questions of degree. *The question is not whether*

*there is any religious effect at all, but rather whether that effect, if present, is substantial."* Allen v. Hickel, 138 U.S.App.D.C. 31, 36, 424 F.2d 944, 949 (1970) (emphasis supplied).

Plaintiffs, in support of their position, presented the testimony of several witnesses, including five Protestant clergymen, a rabbi of the Jewish Reformed group, an atheist, and three psychologists. While their reasons for opposing the creche extended in some instances to the celebration of Christmas as a national holiday, to the inclusion of the Christmas tree in the Pageant, and to the entire Pageant itself, the dominant theme running through most of the testimony was that the creche is a religious symbol and that the display of the creche on federal park land was, in effect, Government sponsorship of such a symbol. Since the symbol concerned the predominant Christian religion, some of the psychological testimony concerned the adverse effect of the creche display on children of minority groups. Other witnesses, sensitive to the secular nature of the Pageant celebration, deplored the inclusion of the creche as a profanation of a symbol which has religious significance. Certain of the witnesses had never seen the Pageant or the creche and their objections were at least, in part, of a theoretical nature. In addition, plaintiffs presented the results of a survey involving 912 interviews taken at the 1970 Pageant attended by approximately 500,000 persons.

It cannot be gainsaid that the Nativity scene, portraying as it does the birth of Christ, has religious significance, whether standing alone or as a part of a larger display which includes such admittedly secular symbols as Christmas trees, reindeer, the Yule Log and the deocrated stage. It is also true that Christmas is celebrated in this country as a national holiday.

Based on our review of the entire record, it is our determination that, given that the display of the creche has a religious effect, such effect is far from substantial. This determination is founded on the following reasons:

*First*: The Pageant as a whole is a distinctly secular event. It was organized in 1954 by the Washington Board of Trade in order to provide an activity which would attract visitors to Washington. In this respect it resembles the Cherry Blossom Festival, the President's Cup Regatta and other events with a commercial sponsorship. Except for the creche, the various components of the Pageant are largely secular. Christmas is now celebrated as a national holiday, and the components of the Pageant are all related to the traditional celebration of Christmas. The creche is one of these components. It is in this setting that the religious significance of the creche must be judged. Very little, if any, of the proof adduced by plaintiffs related to the fact that the impact of the creche must be considered in conjunction with the secular effect of the entire three-week Pageant. Those witnesses who testified to the profanatory effect of the creche underscored the secular quality of the Pageant itself.

*Second*: The creche as a symbol of Christmas appears repeatedly in a secular setting throughout the land. It is seen in department stores, commercial establishments as well as in public places to symbolize the celebration of Christmas, a national holiday. This fact makes it especially difficult to accept the contention that the display of the creche in the Christmas Pageant of Peace has a significant religious impact on the viewing public or that, because the Pageant was conducted on federal park land, the Government has given its approval to the contents of the Nativity scene.

This type of contention is not new. In McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1960), a case concerning the Maryland Sunday Closing Law, the appellants claimed that "Sunday is the Sabbath day of the predominant Christian sects; that the purpose of the enforced stoppage of labor

on that day is to facilitate and encourage church attendance; that the purpose of setting Sunday as a day of universal rest is to induce people with no religion or with marginal religious beliefs to join the predominant Christian sects; that the purpose of the atmosphere of tranquility created by Sunday closing is to aid the conduct of church services and religious observance of the sacred day." 366 U.S. at 431, 81 S.Ct. at 1108. Chief Justice Warren's response was to concede that Sunday closing laws were originally enacted for the religious purpose of observing the Lord's Day, but, after pointing out that over the years secular justifications came more and more into play, concluded, "Thus have Sunday laws evolved from the wholly religious sanctions that originally were enacted." *Id.* at 435,[4] 81 S.Ct. at 1110.

Although the facts of the present case are not "on all fours" with those of *McGowan,* somewhat the same kind of response can be made. Originally, Christmas was celebrated as a religious holiday. Over the years, the religious aspect of this day has waned but the celebration as a holiday continues. The fact that the day is Christmas, a day of particular significance for dominant Christian sects, did not bar the Congress for reasons of the general welfare from proclaiming it a national holiday. The same can be said of Easter and Thanksgiving, both holidays with strictly religious origins.

In the celebration of any national holiday which has an origin in religious observance, it is only natural that some of the original religious traditions should carry over in the observance. As Dean (now Solicitor General of the United States) Griswold said in 1963: "[T]o

say that they [the "Establishment" and "Free Exercise" Clauses of the First Amendment] require that all traces of religion be kept out of any sort of public activity, is sheer invention." Griswold, Absolute is in the Dark—a Discussion of the Approach of the Supreme Court to Constitutional Questions, 8 Utah L.Rev. 167, 174 (1963).

The secular side of Christmas observance cannot be denied. It is universally recognized, even if not accepted by all segments of our plural society. Nor can the religious side of Christmas observance be denied. It is also universally recognized, though not accepted by certain minority groups and at least one important Christian group as well. These are well understood facts of life. Under such circumstances, recognizing that we must strike a reasonable balance, we cannot find that the Christmas Pageant of Peace has a substantial religious impact or that in permitting the display of the creche as part of the entire Pageant, the Government has given its "stamp of approval" to the display.

*Third:* With respect to the opinion survey, which the Court admitted with some reluctance, we are satisfied that little, if any, weight should be given to the results purportedly shown. Any opinion survey, since it involves hearsay, must be conducted with proper safeguards to insure the accuracy and reliability of the results shown. *See* Zeisel, The Uniqueness of Survey Evidence, 45 Cornell L.Q. 322 (1959); Note, 66 Harv.L.Rev. 500, 507–08 (1953); Annot., 76 A.L.R.2d 619 (1961). The present survey, however well intentioned, suffers from serious defects. The wrong universe was used, *i. e.,* only those persons who had seen the creche

4. In a lengthy concurring opinion, Mr. Justice Frankfurter outlined in great detail the religious motivations underlying the original passage of Sunday closing laws. After pointing out that the institution of Sunday "as a time when occupations and atmosphere differ from those of other days of the week has now been a portion of the American cultural scene since well before the Constitution;" he said, "Cultural history establishes not a few practices and prohibitions religious in origin which are retained as secular institutions and ways long after their religious sanctions and justifications are gone." McGowan v. Maryland, 366 U.S. 420, 503–504, 81 S.Ct. 1101, 1177 (1960).

and were interviewed in the vicinity of the creche. A proper universe might well have been those who viewed the creche as part of the entire Pageant. This broader universe was considered and rejected. The questions asked, even assuming the validity of the answers, suffer from confusion and ambiguity and do not come close to the central issue of the case which is "not whether there is any religious effect at all, but whether that effect, if present, is substantial." Allen v. Hickel, 138 U.S.App. D.C. 31, 36, 424 F.2d 944, 949 (1970). Whether those interviewed had also read the plaques describing the history and purpose of the Pageant was not the subject of inquiry. It may well be that the nature of this case makes the framing of precise questions especially difficult, but such, if it is a fact, does not require the Court to overlook the inherent deficiencies in the questions as propounded. Further, the training, instruction and supervision of the three interviewers themselves were totally inadequate.[5] Only one of the three had been instructed by the person in charge of the survey, and one had received no instruction at all. They were not supervised. As a result, there was little uniformity in the method and procedure followed in conducting the interviews or in the selection of the persons or groups interviewed. Despite the attempted gloss of professionalism, the presence of these serious defects undermines whatever evidentiary value might otherwise be given to a survey of this kind.

*Finally,* plaintiffs, citing Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105 (1971), contend that the joint participation by religious leaders in the programming and functioning of the Christmas Pageant of Peace "involves excessive entanglement between government and religion." We have previously discussed the part that religious leaders have played in the planning of the Pageant itself and in providing certain so-called "ceremonial amenities." We concluded that such had little if anything to do with the original secular purpose of the Pageant. Similarly, we do not regard such participation as representing an "excessive entanglement between government and religion."

It is perfectly true that religious groups have been solicited for contributions to support the Pageant, although the total amount of such contributions is not a part of the record. The most recent figure is for 1964 when the Protestant churches contributed a total of $485, and Catholics were not solicited. This contribution would seem to be *de minimis* when it is considered that the General Electric Company alone budgeted $30,000 for lighting the Christmas trees. As was said in Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970) "The test is inescapably one of degree." From a review of the entire record including numerous documentary exhibits, we are unable to find that the participation of religious leaders in the Christmas Pageant of Peace comes close to the "excessive government entanglement with religion" complained of in *Lemon* and *Walz, supra.*

As stated at the outset, the Government adopted the suggestion of the Court of Appeals with respect to "an appropriate accompanying plaque" and at the 1970 Pageant installed plaques at three locations.[6] These plaques describe

---

5. The names of the actual interviewers were furnished after considerable reluctance. Although the interviewers were described as having worked on other surveys "on and off for a period of about ten years," it developed that one had never before conducted a survey for the survey organization, another had done some interviewing in college but never before for the organization, and the third interviewer was unknown to the survey organization and to plaintiffs' counsel, having been recruited by one of the other two.

6. The plaques read as follows:
THE STORY OF THE CHRISTMAS PAGEANT OF PEACE
The Christmas Pageant of Peace is a National Celebration Event. It takes

place annually, during the yuletide season, on the Ellipse (President's Park) area in the Nation's Capital. This national commemorative event celebrating our recognition of Christmas as a national holiday had its beginning as a Pageant of Peace when a group of leaders in the Washington Community conceived it to manifest the Nation's desire to achieve "Peace on Earth, To Men of Good-Will." This central theme of the Pageant is highlighted by the ceremonial lighting of the National Christmas Tree by the President of the United States.

The Pageant has been repeated as an annual National Celebration Event, expressing this theme in commemoration of our Nation's observance of Christmas as a national holiday, every year since 1954. Now, the Pageant of Peace is firmly established as a national tradition, a visible expression of this Nation's aspiration to foster peace, understanding and friendship between the nations of the world and the American People.

The principal attraction of this annual National Celebration Event, the National Christmas Tree, is given each year by a different State. The General Electric Company and its engineers design and light this beautiful arboreal tribute to the yule season.

The custom of lighting a National Christmas Tree dates back to 1923 when President Calvin Coolidge walked out on the south lawn of the White House to light a tree from his native State of Vermont. This custom has since continued during the succeeding administrations of each of our Presidents.

President Eisenhower lit the first National Christmas Tree from the Christmas Pageant of Peace in 1954. That tree was given by the citizens of the State of Michigan. Since then trees have come from Maine, Minnesota, Montana, New Mexico, New York, Oregon, South Dakota (twice), Utah, West Virginia and Vermont, among others.

Lining the "Pathway to Peace" leading up to the National Christmas Tree are 57 smaller trees. These are a gift from the Erie Mining Company and the American Mining Congress. The 57 trees are all 12 feet tall, representing each of the fifty States and seven Territories of the United States of America.

Beyond its central "peace" theme, the Pageant commemorates the Nation's celebration of Christmas as a national holiday, by depicting all the traditional aspects of our national history associated with Christmas. In addition to the beautifully decorated and illuminated National Christmas Tree and 57 smaller trees, there is a Yule log, reindeer, and an illuminated creche display. An illuminated stage is also erected. On this stage, many musical and ceremonial programs traditionally associated with the Nation's observance of Christmas as a national holiday take place during the three weeks of the Pageant.

The traditional Yule log, burning day and night throughout the Pageant and offering warmth to those taking part in the Pageant festivities, commemorates the good fellowship aspect of Christmas. The eight reindeer, who normally live at the Washington Zoological park, represent "Santa's reindeer." Their presence commemorates the gifts and greeting aspect of Christmas. These reindeer make their annual trip to the corral near the brilliantly lighted National Christmas Tree, so that the children may enjoy a close look at "Santa's reindeer." The illuminated creche depiction of the birth of Christ commemorates the religious heritage aspect of our Nation's celebration of Christmas as a national holiday.

The Christmas Pageant of Peace is jointly sponsored by Christmas Pageant of Peace, Inc. and the National Park Service. Christmas Pageant of Peace, Inc., is a non-sectarian, non-partisan civic organization. The National Park Service sponsors the Pageant on the basis that this National Celebration Event is wholly secular in character, purpose, and main effect. The illuminated creche display is intended to be reverential to the religious heritage aspect of Christmas; but that display is not meant, and should not be taken, either to promote religious worship, or profane the symbols of any religion. The sponsors trust that religious believers, non-believers and disbelievers, alike, can set aside all religious differences, and enjoy this National Celebration Event in the Christmas-tide spirit evinced by the central theme of the Pageant.

The Christmas Pageant of Peace will continue until January 3, 1971. At that time the lights will be turned off, and this annual National Celebration Event will come to an end. But it is profoundly to be hoped that, with the coming of the New Year, an era of "Peace on Earth, to Men of Good-Will" will come to reign supreme everywhere in the world.

Dedicated by the Pageant Sponsors, Christmas Pageant of Peace, Inc. & National Park Service, U. S. Department of the Interior.

in some detail the history and secular purpose of the Christmas Pageant of Peace and anyone reading them would be under no misconception that the Pageant in general or that the creche in particular were displayed for any purpose other than that of celebrating Christmas as a national holiday. While the description to some may seem overly long and not a model of simple prose, it is our judgment that these plaques should calm any doubts or lurking suspicions that the Government, in participating in the Christmas Pageant of Peace has given its stamp of approval to the religious content of the presentation of the Nativity scene. We recommend that the use of these plaques or plaques of similar content be continued.

For all of the foregoing reasons, we hold that the religious impact of the creche, while present, is not substantial and the Government sponsorship of the Pageant does not violate either the Establishment or Free Exercise Clauses of the First Amendment. Judgment is accordingly entered for the defendants.