**CITIZENS CONCERNED FOR SEPARATION OF CHURCH AND STATE, Plaintiff,**

v.

**The CITY AND COUNTY OF DENVER, Defendant.**

Civ. A. No. 80–DW–1661.

United States District Court, D. Colorado.

Feb. 20, 1981.

Jonathon B. Chase, American Civil Liberties Union Foundation of Colorado, Inc., Boulder, Colo., Daniel H. Israel, Dechert, Price & Rhodes, Denver, Colo., for plaintiff.

Stan M. Sharoff and Darlene M. Ebert, Asst. City Attys., Denver, Colo., for defendant.

WINDER, District Judge, Sitting by Designation.

This is a civil action in which Citizens Concerned for Separation of Church and State (Citizens), an unincorporated association, seeks a declaratory judgment and a preliminary and permanent injunction to enjoin the City and County of Denver (City) from displaying, storing, and appropriating public funds for a nativity scene which is part of the City and County of Denver's Annual Christmas Lighting Program. The claim arises under 42 U.S.C. § 1983 and jurisdiction is based on 28 U.S.C. § 1343(3). The plaintiff asserts that the presence of the creche on the steps of the City and County Building violates the Establishment Clause of the First Amendment.

A nearly identical case was filed in this court on November 28, 1979. Following a hearing on plaintiff's motion for a preliminary injunction, the matter was consolidated with a trial on the merits. Fed.R.Civ.P. 65(a)(2). Judge Richard P. Matsch ruled in favor of the plaintiff and enjoined the defendant from including the nativity scene in its Christmas lighting display. 481 F.Supp. 522 (D.Colo.1979). On appeal, the Tenth Circuit Court of Appeals held that it was without jurisdiction to hear the case because plaintiff had failed to prove it had the requisite standing to seek relief. The appeal was dismissed and the cause remanded to the district court with instructions to vacate its judgment. 628 F.2d 1289 (10th Cir. 1980).

The present action was filed on December 2, 1980. The hearing on plaintiff's motion for a preliminary injunction was held on January 12 and 13, 1981. Unlike the earlier case, the parties did not stipulate to a consolidation with a hearing on the merits. However, they did stipulate that certain testimony and exhibits from the earlier case could be used as evidence in the present case. Inasmuch as the background facts of this case have been adequately set out in the published opinions of the district court and court of appeals in the earlier case, only those additional facts pertaining specifically to this case will be discussed in this opinion.

In the Tenth Circuit's decision, the court pointed out that the defect in standing was not one of pleading, but rather one of proof. Plaintiff failed to

present any evidence, direct or circumstantial, relative to its organizational status, structure, purpose or relationship to or with any person or persons. Witnesses called by Citizens did not testify relative to Citizens or their associational relationship thereto. Furthermore, no witness testified that he or she was a taxpayer of the City and County of Denver of the State of Colorado. To be sure, the witnesses did testify to matters going to the merits of the First Amendment claims.

628 F.2d at 1298.

■ At the hearing in this case, plaintiff called one of its members who testified that Citizens was an unincorporated association of five members, each of whom had submitted an affidavit in support of the motion for a preliminary injunction. Citizens has no charter, no bylaws, no membership dues, no treasury, no property, no formal structure, and pays no taxes. It meets whenever its members want to and had met four times in the six months prior to the hearing. The purpose of Citizens is to prevent the City and County of Denver from including a nativity scene as part of its annual lighting display at the City and County Building. At least one of its members pays property tax and one or more pay gas tax, sales tax, and occupational tax to the City and County of Denver.

Plaintiff did present evidence to show its organization and purpose. In addition, the evidence showed that members of Citizens pay taxes that go to erect, maintain, and store the City's lighting display which includes the creche. Although this evidence

was not impressive, the court finds that it is sufficient to establish that plaintiff has the requisite standing to bring this case.

In approaching cases dealing with the relationship between religion and government under the First Amendment, the Supreme Court has announced a three-part test for determining whether governmental activity is permissible under the Establishment Clause:

First, the [action] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the [action] must not foster "an excessive government entanglement with religion."

*Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

## I. *Purpose*

■ Citizens contends that because the nativity scene is a religious symbol, its inclusion in the City's lighting display must be for a religious purpose. *See Stone v. Graham*, —— U.S. ——, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980); *Hall v. Bradshaw*, 630 F.2d 1018 (4th Cir. 1980). Defendant argues that the purposes of the nativity scene and the other elements that compose the lighting display are to promote goodwill and feelings of selflessness, to enhance Denver's national reputation, and to depict the historical origins of Christmas, a national legal holiday.

Wilbur Latham, the man responsible for the lighting display and its contents, testified that he included the nativity scene because it was part of Christmas, just like Santa Claus and the reindeer. He stated that he attaches no religious significance to the creche and had no religious purpose for including it. Latham also testified that he placed the creche, Santa Claus, the reindeer, and Santa's workshop on the steps of the City and County Building because it was less costly and required less protective fencing.

A city council member who is also the chairman of the City's budget and finance committee described the method by which funds were appropriated for the lighting display. The city council is presented with a budget that includes the lighting display as a part of the mayor's current events. As such, the council does not vote specifically on the lighting display or the elements that compose it. The city council member testified that it was not his intent or purpose to advance Christianity by approving the budget that included the lighting display.

Other witnesses testified to the secular purpose of including the nativity scene in the City's lighting display. A doctoral student in folklore and folklife testified that the nativity scene is a common item of American folklore. She noted that, among its contemporary uses, the nativity scene is displayed on Christmas cards and as paintings on store windows. She also testified that the use of the nativity scene is becoming increasingly secularized. A historian testified that as early as 1947 there is evidence that the nativity scene was central to the artistic plan of the City's lighting display. He stated that the inclusion of the creche in the lighting display was a Denver tradition. The historian also testified that Denver's lighting display had received favorable publicity in national magazines and had also been used on post cards.

In another nativity scene case, the Court of Appeals for the District of Columbia considered whether the inclusion of a creche in the Christmas Pageant of Peace violated the First Amendment. *Allen v. Hickel*, 424 F.2d 944 (D.C.Cir.1970). The court noted that the government "may depict objects with spiritual content, but it may not promote or give its stamp of approval to such spiritual content." In discussing the purpose of the creche, the court reviewed the language in a pageant pamphlet that "the creche was intended to be simply one of a group of objects assembled to show how the American people celebrate the holiday season surrounding Christmas." As such, the court found its purpose no more objectionable than that of a postage stamp bearing a reproduction of a religious painting or a government-sponsored museum display illustrating various religions or holiday customs.

Similarly, in *Florey v. Sioux Falls School District*, 619 F.2d 1311 (8th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 409, 66 L.Ed.2d 251, a public school board's rules were held not to violate the First Amendment. These rules allowed observance of holidays having both religious and secular bases through programs containing music, art, literature, and drama having religious themes and through temporary display of religious symbols associated with religious holidays. In considering the purpose of the rules, the court viewed the thrust of them to be "the advancement of the students' knowledge of society's cultural and religious heritage, as well as the provision of an opportunity for students to perform a full range of music, poetry and drama that is likely to be of interest to the students and their audience." The court explained that even if the school board desired to observe the religious basis of holidays, the Constitution did not necessarily forbid the use of materials that have a "religious basis." "Government involvement in an activity of unquestionably religious origin does not contravene the Establishment Clause if its 'present purpose and effect' is secular." 619 F.2d at 1315.

The court finds that the present factual situation is more like *Allen* and *Florey* than *Stone v. Graham* and *Hall v. Bradshaw*. As in *Allen*, the nativity scene here was "intended to be simply one of a group of objects assembled to show how the American people celebrate the holiday season surrounding Christmas." 424 F.2d at 949. The evidence does not establish that the defendant promoted or gave its stamp of approval to the religious content of the creche. The teaching of both *Allen* and *Florey* is that a religious symbol can be used if there is a secular purpose. The purpose of a challenged display can only be discerned by considering the entire display and the context in which it is presented.

*Stone* and *Hall* are not to the contrary. In *Stone*, the Supreme Court struck down a Kentucky statute that required the posting of a copy of the Ten Commandments on the wall of every public classroom in the state. The court found that the statute violated the purpose part of the *Lemon* test because the Ten Commandments were not integrated into the school curriculum. The Supreme Court has more closely scrutinized claimed Establishment Clause violations in a school setting than in a public setting. The Tenth Circuit has also recognized this when it ruled that a monolith on a courthouse grounds on which the Ten Commandments were inscribed did not violate the Establishment Clause. *Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir. 1973). In *Hall v. Bradshaw*, the court enjoined a state agency from including a "motorist's prayer" on a state map that the agency published and distributed free of charge. Relying on Supreme Court prayer cases, the court stated that it was not the business of government to compose official prayers. *But see Bogen v. Doty*, 598 F.2d 1110 (8th Cir. 1979) (upholding county board practice of having a prayer by local unpaid clergymen prior to the commencement of each board meeting). The court regards the facts in *Hall* as being much more supportive of an Establishment Clause violation than those in the instant case.

## II. *Effect*

■ In determining whether the City's inclusion of a nativity scene in its lighting display has a principal or primary effect that advances or inhibits religion, the court once again must consider the nativity scene as an integral part of the City's lighting display and not in isolation. *Allen v. Morton*, 495 F.2d 65, 74 (D.C.Cir.1973) (Tamm, J.); *Fox v. City of Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978) (Bird, C. J., concurring). When viewed in the context of the lighting display and the Christmas season, the question for the court is "not whether there is any religious effect at all, but rather whether that effect, if present, is substantial." *Allen v. Hickel*, 424 F.2d at 949.

The nativity scene is only one of many components in the City's block-long lighting display. It is placed on the steps of the City and County Building next to Santa Claus, the reindeer and sleigh, and Santa's

workshop. The figures that compose the nativity scene are of a similar size to Santa Claus and the reindeer. From a distance or at night, the creche is hardly distinguishable. This display is lit during the annual Christmas holiday season. The lights are turned off after New Year's Day and turned on again in mid-January for the ten days of the National Western Stock Show.

The court observes as did the district court in *Allen v. Morton,* 333 F.Supp. 1088 (D.D.C.1971), that Christmas is celebrated as a national holiday and the components of the City's lighting display are all related to the traditional celebration of Christmas. The nativity scene is one of these components. As a symbol of Christmas it appears repeatedly in a secular setting. "It is seen in department stores, commercial establishments as well as in public places to symbolize the celebration of Christmas, a national holiday." *Id.* at 1093.

Citizens argues that the City's inclusion of the nativity scene is viewed as the City's endorsement of the religious content of the nativity scene. In support of this theory, Citizens called witnesses who testified that they viewed the nativity scene in front of the City and County Building as the City's endorsement of Christianity. Citizens also introduced several packets of letters and petitions to the Mayor of Denver opposing removal of the nativity scene. It is contended that the letters and petitions are persuasive evidence of the widely held public perception that the City is endorsing Christianity by including the nativity scene in its lighting display.

■ The City presented evidence that showed the nativity scene is a traditional symbol of Christmas that appears in many secular settings. Although the nativity scene is of religious origin, it has "acquired a significance which is no longer confined to the religious sphere of life." *Florey v. Sioux Falls School District,* 619 F.2d at 1316. Like the materials related to Christmas and other holidays in *Florey,* and as discussed by the doctoral student in folklore, the nativity scene has become integrated into our culture and heritage. When viewed in the context of the entire lighting display and the evidence presented as to the use of the nativity scene in secular settings, the court cannot accept plaintiff's argument that because the creche is on the steps of the City and County Building, the City has given its approval to the contents of the creche.

■ It is the opinion of the court that little weight should be given to the letters and petitions which were admitted into evidence over the City's objection and with some reluctance by the court. They were admitted for the limited purpose of establishing that the City was on notice that various persons perceived the creche as a religious symbol. As hearsay, they were not admitted to prove the truth of the matters asserted in them. Given this limited purpose, it would be improper to consider them as evidence that the authors and signatories of these writings desired the retention of the creche for religious reasons. Without having the benefit of their testimony, subject to cross-examination, the court would be speculating as to what actually motivated these persons to write or to sign the petitions. As a matter of fact, few, if any, witnesses who testified at the hearing and who opposed the removal of the creche testified that they wanted it left in the lighting display for religious reasons or perceived that its inclusion in the display was religiously motivated.

Two psychologists called by Citizens testified that the nativity scene would have an adverse impact on children of minority religions who viewed the scene. One psychologist was of the opinion that the creche would encourage prejudice against these children and also encourage them to deny their beliefs. She noted that it would also have an unfavorable impact on their self-esteem. This psychologist testified that the impact on children of minority religions would be greater if the nativity scene were on public property rather than on private property. Both psychologists based their opinions on general studies and majority-minority group literature. One of them also based her opinion on some clinical ex-

perience. Both of these psychologists acknowledged that they were unaware of any literature or studies which specifically dealt with what effect the viewing of nativity scenes or other religious symbols might have upon children.

The psychologist called by the City refuted the testimony of plaintiff's psychologists and effectively so in the opinion of the court. He stated that there has been no research or studies that would support the theory of plaintiff's psychologists and that the studies and literature they relied on did not have application to the facts of this case. He testified that the nativity scene in question is neutral and that, in viewing it, children as well as all persons, would bring to it their own meaning. He also attached no increased significance to the viewer in seeing it on government, rather than private, property. He also testified that it would be mere speculation to give an opinion as to what the effect would be upon a viewer, including a child, unless the expert had the benefit of a study dealing with nativity scenes or at least, religious symbols.

Other of plaintiff's witnesses testified that they felt angry and fearful when viewing the City's nativity scene. Some of these witnesses stated that they also get angry with "In God We Trust" on coins and references to God in public ceremonies. Other witnesses, including theological experts, stated that the City's display of the nativity scene was blasphemous. Some testified that it cheapened what the symbol stands for. These witnesses who testified to the profanatory effect of the nativity scene underscored the secular quality of the City's lighting display. *Allen v. Morton*, 333 F.Supp. at 1093. No witness testified that he was more a Christian or less an atheist because of the City's lighting display.

Based upon the evidence presented at the hearing and the stipulated transcript of the earlier trial, the court finds that the inclusion of the nativity scene in the context of the other objects of the lighting display does not have a primary effect that advances or inhibits religion.

### III. *Entanglement*

■ Citizens argues that the City's placement of the nativity scene in its lighting display creates an excessive government entanglement with religion. The Supreme Court decisions cited by Citizens in support of the entanglement test deal with governmental aid to sectarian institutions, not with factual situations similar to that of the present case. In the parochial aid cases, the Supreme Court has examined four factors to determine whether government entanglement with religion is excessive: (1) the character and purposes of the institutions that are benefited, (2) the nature of the aid that the government provides, (3) the resulting relationship between the government and the religious authority, and (4) the divisive political potential of the government aid. *Lemon v. Kurtzman*, 403 U.S. 602, 615, 622–23, 91 S.Ct. 2105, 2115–16, 29 L.Ed.2d 745 (1971).

Assuming these factors are applicable to the present case, there was no evidence to show that any religious institutions or groups were benefited by the City's nativity scene. No aid was given and no relationship between the City and religious institutions resulted. As to alleged political divisiveness, the court observes that in light of the secular purpose of the total display and a non-religious primary effect, no religious group or groups are being benefited and divisiveness on religious lines is not likely to be intensified.

In conclusion, a quotation from Justice Douglas is applicable. In *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), he discussed the hostility that could result in church and state relations if a common sense approach were not used.

The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other—hos-

tile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; "so help me God" in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: "God save the United States and this Honorable Court."

343 U.S. at 312–13, 72 S.Ct. at 683.

Fastidiousness or overzealous rigidity has never been the test, nor should it be. While government must be sensitive to the religious beliefs or disbeliefs of its citizens, it is not required to abandon common sense. If it were determined on the evidence in this case that there was a violation of the Establishment Clause, there appears no reason why prayers in our legislative halls or "In God We Trust" on our coins would not also be unconstitutional.

Based on the foregoing, which shall constitute the findings of fact and conclusions of law,

IT IS ORDERED that plaintiff's motion for a preliminary injunction is denied.