Reverend Thomas B. **ALLEN** et al.

v.

Rogers C. B. **MORTON**, Secretary of
the Interior, et al.

No. 71–1909.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 6, 1972.

Decided Sept. 26, 1973.

Warren K. Kaplan, Washington, D. C., with whom Ralph J. Temple and Hope Eastman, Washington, D. C., were on the brief, for appellants.

Edwin E. Huddleson, III, Atty., Dept. of Justice, L. Patrick Gray, III, Washington, D. C., was also on the brief at the time it was filed. Harold H. Titus, Jr., U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for appellees. Morton Hollander, Atty., Dept. of Justice, John A. Terry, Joseph M. Hannon and Gil Zimmerman, Asst. U. S. Attys., also entered appearances for appellees.

Before TAMM, LEVENTHAL and ROBB, Circuit Judges.

PER CURIAM:

The court is of the view that the judgment must be reversed because the plaintiffs are entitled to a decree enjoining the continuance of the Government's current participation in the Christmas Pageant of Peace, including as it does a membership in planning and organization committees that violates the "entanglement" test of the Establishment clause of the First Amendment. On this point the opinions filed by Judges Tamm and Leventhal are in accord.

Following the reinstatement of the complaint plaintiffs will be entitled to a decree, but a question may arise as to its proper scope. No further legal question arises if the pertinent groups and officials of the Christmas Pageant of Peace conclude that the creche will be discontinued as to future Pageants. If the creche is retained, and the Government decides to terminate all sponsorship or connection with the Pageant, appropriate plaques should be ordered by the District Court, as set forth in Judge Leventhal's opinion. If the creche is retained and the Government wishes to maintain a connection with the Pageant—say, limited to the financial aid presently provided and/or technical sponsorship—it will have to prepare new regulations or amendments to the existing regulations. These regulations or modifications would have to be grounded in neutral principles and criteria that assure non-discriminatory definition of the events that are afforded any such Government aid or technical sponsorship. It is the opinion of the ·Court, however, that if the Government promulgates the regulations and the Christmas Pageant of Peace qualifies for financial aid or technical sponsorship thereunder, such Government involvement will not be constitutionally defective.* Of course, any proposal for retention of Government connection with the Pageant would

---

* Judge Leventhal is of the view that while he does not discern in what respect a new regulation that comports with the requirement of neutral principles and non-discriminatory criteria could run afoul of the Establishment clause, he would prefer to withhold any pronouncement on that issue pending the emergence of such regulation and of any legal controversy that may take shape.

have to be accompanied by a proposal for appropriate plaques.

Reversed and remanded for further proceedings.

Opinion filed by Circuit Judge TAMM in which Circuit Judge ROBB concurs.

TAMM, Circuit Judge.

In Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597, 602 (1969), a decision dealing with the right of access to Government owned property, Judge Leventhal noted that the Government's co-sponsorship of the Christmas Pageant of Peace "[might] raise more questions than it answers." One of those questions, specifically that relating to the First Amendment's establishment and free exercise clause, has been tortuously wending its way through the courts since July 4, 1969, and today hopefully reaches final disposition. Mr. Justice Powell has recently noted that cases arising under the First Amendment clauses "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," have presented "some of the most perplexing questions to come before this Court." Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 760, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973). This case, we unhappily anthropomorphize, is similarly disposed to perplex, confuse, and even frustrate, so sensitive and complex are the issues it presents.

We will not unduly quantify our opinion with a re-recitation of facts already ably and extensively set out in Judge Leventhal's opinion herein, in the 1970 opinion of this court remanding this very action to the district court for further fact-finding, Allen v. Hickel, 138 U.S.App.D.C. 31, 424 F.2d 944 (1970), and in the district court's opinion from which this appeal was taken, Allen v. Morton, 333 F.Supp. 1088 (D.D.C 1971). We will structure the opinion within the framework of the purpose, primary effect, and excessive entanglement tests, reiterating only those facts specifically

relevant to our analysis. The propriety of that three-part test is well established, as Mr. Justice Powell stated recently in Nyquist, supra, 413 U.S. at 772–773, 93 S.Ct. at 2965:

[T]he now well defined three-part test that has emerged from our decisions is a product of considerations derived from the full sweep of the Establishment Clause cases. Taken together these decisions dictate that to pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose, e. g., Epperson v. Arkansas, 393 U.S. 97 [89 S.Ct. 266, 21 L.Ed.2d 228] (1968), second, must have a primary effect that neither advances nor inhibits religion, e. g., McGowan v. Maryland, [366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)]; School District of Abington Township v. Schempp, 374 U.S. 203 [83 S.Ct. 1560, 10 L.Ed.2d 844] (1963), and, third, must avoid excessive government entanglement with religion, e. g., Walz v. Tax Comm'n, [397 U.S. 664, 90 S. Ct. 1409, 25 L.Ed.2d 697] (1970)] See Lemon v. Kurtzman, [403 U S. 602, 612–614, 91 S.Ct. 2105, 29 L.Ed. 2d 745 (1971)]; Tilton v. Richardson, 403 U.S. 672, 678 [91 S.Ct. 2091, 29 L.Ed.2d 790] (1971). (footnote omitted.)

## I. Purpose

When determining "purpose" in this situation we are faced with an unusual problem, for as Judge Leventhal has pointed out in his opinion we are unable to follow "the familiar analysis of the intent of a legislature" and rather must "discern the purposes of activities of officials of the Executive Branch." Our de novo look at the record has convinced us when considering both the stated purposes of the Pageant and the actions of the Government officials involved over the past two decades as reflecting upon the Government's adherence to those stated purposes, that the Government's involvement in the Pag-

eant of Peace "reflect[s] a clearly secular . . . purpose."

The Pageant itself is an outgrowth of the traditional National Community Christmas Tree Celebration, and as the record amply demonstrates evolved in 1954 as a vehicle for bolstering tourism in the District of Columbia.[1] On a more philosophical level its continually expressed purpose has been that of manifesting this "nation's desire for 'Peace on Earth, Goodwill Toward Men.'" The Pageant is conducted each year at the approximate time of the celebration of the national legal holiday of Christmas, and is meant to serve as "a visible expression of this Nation's aspiration to foster peace, understanding and friendship between the nations of the world and the American People." The creche itself, while obviously a religious symbol, is part of a commemoration of "the Nation's celebration of Christmas as a national holiday, by depicting all the traditional aspects of our national history associated with Christmas." While the creche is utilized neither to promote nor profane any religion, it is "intended to be reverential to the religious heritage aspect of Christmas." [2]

These are the express purposes for both the existence of the pageant as a whole and the creche as one of its many integral parts, and they have been consistently stated throughout the history of the Pageant. We can find nothing in the record to convince us that the Government's involvement, which is similar in kind to its cooperation with other national celebration events, e. g., The Cherry Blossom Festival, the President's Cup Regatta, and the National Independence Celebration, is predicated upon any other, non-secular purpose.[3] We note, however, that "the propriety of . . . purposes may not immunize from further scrutiny a law which either has a primary effect that advances

1. *See* Allen v. Morton, 333 F.Supp. 1088, 1092 (D.D.C.1971), and the references to the record contained therein:

> [T]he basic purpose of the Pageant, however clothed, has always been admittedly secular It was to provide a colorful event during the Christmas season which would attract visitors to Washington and thereby increase the business of local merchants.

2. *See* The Story of the Christmas Pageant of Peace, 1970 Program, Pl. Exhibit, 2, *and* the text of the plaques similarly titled and installed on the grounds of the Pageant on our recommendation, reprinted at 333 F. Supp. 1095 n.6. We agree with Judge Leventhal that caution must be taken in utilizing the language of the plaques, since they were written in light of this litigation and thus are susceptible to self-serving statements. However, we find that their message is essentially the same as that consistently given in the Programs from past years. *See, e. g.,* the 1964, 1965, 1966, 1967, 1968, 1970 Programs, Def. Ex. 51, 53, Pl. Ex. 15, 17, 18, 2.

3. We noted in Allen v. Hickel, 138 U.S.App. D.C. 31, 424 F.2d 944, 949 (1970), following reference to printed material in an official Pageant of Peace pamphlet:

> This language as to purpose of the Pageant sets forth that the creche was intended to be simply one of a group of objects assembled to show how the American people celebrate the holiday season surrounding Christmas. As such its purpose is no more objectionable than that of a postage stamp bearing a reproduction of a religious painting or a Government-sponsored museum display illustrating various religious or holiday customs.

*See* Affidavit of Russell Dickerson, Associate Regional Director, National Capital Region, National Park Service, Def. Ex. 1, para. 3:

> The National Park Service views its official cooperation with the Christmas Pageant for Peace, Inc., in the production of the Christmas Pageant, and in making the Ellipse (President's Park) area available to that organization, on its request, in connection with that event, as proper National Park Service functions. We similarly extend our cooperation to other private organizations which sponsor the production of officially recognized national celebration events, such as the Cherry Blossom Festival, the President's Cup Regatta, the National Independence (Fourth of July) Celebration. We likewise cooperate in other National-Capital-Park-connected events in the Nation's Capital. The officially recognized national celebration events in particular attract to the National Capital Park areas thousands of visitors who are thus enabled to enjoy those park areas in the very recreational aspects to which Congress has directed their primary dedication. See 16 U.S.C. §§ 1, 20–20g; 36 C.F.R. § 50.19(d)(2).

religion, or which fosters excessive entanglements between Church and State." *Nyquist, supra,* 413 U.S. at 774, 93 S.Ct. at 2966.[4]

## II. Primary Effect

The Government's participation in the Pageant is twofold: (1) Various Government officials play an active role in its management and organization, occupying two of the five positions on the Executive Committee, and two of the ten positions on the important Program Committee;[5] (2) the Government "cosponsors" the Pageant and provides labor assistance in the assembly, dismantling, cleaning and restoration of the area, along with various materials and equipment for use in the Pageant. The expense involved is more than nominal —in 1968, for example, the cost to the Government for the services it expended amounted to nearly $72,000.[6] Since 1968, however, the Government has refrained from supplying any assistance in the assembly, storage, or maintenance of the creche. The Christmas Pageant of Peace, Inc. bears the cost of electricity used to light the creche and is solely responsible for its use.[7] As we find the former type of participation infirm under the entanglement test discussed *infra,* for purposes of discussion of the primary effect of the Government's involvement we will consider only the effect of its financial assistance and nominal co-sponsorship.

■ The recent *Nyquist* opinion elucidates that Government action may have multiple "primary" effects, in the sense that the constitutional propriety of an action depends not on whether the primary effect is legitimately secular but on whether the action in any way has the "direct and immediate effect of advancing religion," or conversely "only

a 'remote and incidental' effect advantageous to religious institutions." *Nyquist, supra,* 413 U.S. at 784, 93 S.Ct. at 2971 n. 39. It matters not in our analysis whether this may be considered a widening of the primary effect test beyond previous precedent (although Mr. Justice Powell's discussion should belie such a consideration, *see Nyquist, supra,* 784 U.S. at 413, n. 39, 93 S.Ct. 2955) for our review of the record convinces us that the Government's limited involvement in the Pageant of Peace can have no more than a "remote and incidental" effect advantageous to religious institutions.

■ In Hunt v. McNair, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973), the Supreme Court iterated the guidelines to be followed in administering the primary effect test:

Aid normally may be thought to have a primary effect of advancing religion [1] when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or [2] when it funds a specifically religious activity in an otherwise substantially secular setting.

The first of these categories recognizes that religion can so permeate a specific activity that its "religious and secular . . . functions are in fact inseparable," Tilton v. Richardson, 403 U.S. 672, 680, 91 S.Ct. 2091, 2097, 29 L.Ed.2d 790 (1971), while the second recognizes that even if the religious and secular functions are separable, without proper controls (whose extensiveness vary proportionately with the degree of religious permeation, *see Hunt, supra,* 413 U.S. at 734, 93 S.Ct. 2868) the Government involvement may nonetheless have a primary effect of aiding religious activity. *See Nyquist, supra,* 413 U.S. at 774, 93

4. For a compact discussion of the development of purpose, primary effect, and excessive entanglement tests *see* Note, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 1, 171–173 (1971).

5. These figures represent the breakdown for the 1970 Pageant, and are the most recent

available in the record. *See* The 1970 Christmas Pageant of Peace Program, Pl. Ex. 2.

6. *See* Def. Ex. 1, attachment H2.

7. *See* Def. Ex. 1, attachment E.

S.Ct. at 2966, where maintenance and repair grants for parochial elementary and secondary schools were struck down because, as the Court stated, "[n]o attempt is made to restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes, nor do we think it possible within the context of these religion-oriented institutions to impose such restrictions."

The Supreme Court has yet to find aid to an institution constitutionally defective because religion so permeated the institution that the secular and sectarian functions were inseparable.[8] It has noted, however, a very real distinction between the degree of permeation that exists in parochial elementary and secondary schools as compared to Church-related institutions of higher learning. *See Hunt, supra,* 413 U.S. at 734, 93 S.Ct. 2868; *Nyquist, supra,* 413 U.S. at 776 n. 32, 93 S.Ct. 2967; *and* Lemon v. Kurtzman, 403 U.S. 602, 615–620, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Yet, even in the instance of aid to parochial elementary and secondary schools, institutions which the Court referred to in *Lemon, supra,* 403 U.S. at 616, 91 S.Ct. 2105, as involving "substantial religious activity and purpose,"[9] aid in the form of secular textbooks was permitted in Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060

(1968). In *Tilton, supra,* 403 U.S. at 681, 91 S.Ct. at 2097, the Court specifically took note that "[in *Allen*] the Court refused to assume that religiosity in parochial elementary and secondary schools necessarily permeates the secular education that they provide." The Court has also twice specifically rejected such a proposition with respect to Church-related institutions of higher learning, in *Tilton, supra,* 403 U.S. at 680–681, 91 S.Ct. 2091, and *Hunt, supra,* 413 U.S. at 663, 93 S.Ct. 2868. In *Tilton* the Court enumerated factors which might suffice to invalidate Government aid to educational institutions under this category of the effect test. Among these were religious restrictions on admissions, required attendance at religious activities, compelled obedience to the doctrines and dogmas of a particular faith, required instruction in theology and doctrine, and a general purpose of propagating a particular religion.[10]

■ While we recognize that comparisons of the situation *sub judice* with the aid-to-education decisions of the Supreme Court can be misleading, we do not believe that the record shows the Pageant to be the type of institution with which the Court was concerned when it spoke of one "in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission." The governing body

---

8. Our interpretation of the "subsumed" test is one which automatically disqualifies any form of assistance or Governmental involvement with a particular institution because the institution is so sectarian that even what would normally be considered its secular functions are subsumed in a religious mission. In Tilton v. Richardson, 403 U.S. 672, 680, 91 S.Ct. 2091, 2097, 29 L.Ed.2d 790 (1971), the Court stated:

Under this concept appellants' position depends on the validity of the proposition that religion so permeates the secular education provided by church-related colleges and universities that their religious and secular educational functions are in fact inseparable.

The Supreme Court has recognized that parochial elementary and secondary schools are institutions which closely approach this limit, although Board of Education v. Allen, 392

U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), would seem to belie the proposition that separating the secular from sectarian is in all instances impossible.

9. Some of the factors which the Court noted in *Lemon* in reaching such a conclusion are the proximity to parish churches, the religious symbols and statutory adorning the school buildings, religiously oriented extracurricular activities, and the dedicated efforts of the nuns who comprised approximately two-thirds of the teachers to provide an atmosphere in which religious instruction and vocations are natural and proper parts of the life in such schools. These various characteristics make the schools "a powerful vehicle for transmitting the Catholic faith to the next generation."

10. *See* Tilton v. Richardson, 403 U.S. 672, 682, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

of the Pageant, the Christmas Pageant of Peace, Inc., is a non-sectarian, non-partisan, non-profit civic organization organized and promoted by the Washington Board of Trade; its reason for existence is not the furtherance of a religious mission, but, bluntly speaking, the furtherance of tourism in the District of Columbia; it accomplishes this through a Pageant celebrating the national legal holiday of Christmas, dedicated to peace and understanding and following the admirable theme of "Peace on Earth, Goodwill Toward Men;" the Pageant itself is not subsumed in religiosity, but rather the creche, the only religious symbol in the celebration, is one of many integral displays and is manifestly utilized only to emphasize the religious heritage aspect of the Christmas holiday; finally, although good motives cannot save impermissible actions, the Supreme Court has made clear that analysis of activities and reason for being can have a direct bearing on the permeation of religiosity in any institution.[11] It would be carrying the logic of the primary effect test to an unwarranted extreme to find in this case that appellant's proof that the creche was a patently religious symbol met its burden of showing that the Pageant is "an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission." *See Hunt, supra,* 413 U.S. at 746 n. 8, 93 S.Ct. at 2876.

Such a finding does not save the Government's involvement with the Pageant from further scrutiny, for its

association with the Pageant—an activity we classify as "substantially secular" —may nevertheless be prohibited because of its contact with an ostensibly "sectarian" aspect thereof, the creche.[12]

The Government, of course, must comply with the mandates of the Constitution. Where it becomes involved in activities that are subject to First Amendment scrutiny it must take pains to limit its involvement in such a way that it results in no "direct and immediate" effect advantageous to religion. Failure to so limit its involvement can (as in *Nyquist, supra*) render such involvement constitutionally defective, and the degree of religiosity permeating the activity with which it is involved can have a direct bearing on what controls it must establish. As the Court stated in *Hunt, supra,* 413 U.S. at 746, 93 S.Ct. at 2875:

> The Court's opinion in *Lemon* and the plurality opinion in *Tilton* are grounded on the proposition that the degree of entanglement arising from inspection of facilities as to use varies in large measure with the extent to which religion permeates the institution.

Although that language appeared in the discussion of excessive entanglement, we find it accentuates the fact that we are involved in a balancing test, considering variables such as the degree of sectarianism in the institution or event with which the Government is involved, the extent of the Government's involvement, and the controls placed thereon.[13] It is

11. *Id. See also* Lemon v. Kurtzman, 403 U. S. 602, 616, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

12. The second part of the primary effect test, "[a]id normally may be thought to have a primary effect of advancing religion . . . when it funds a specifically religious activity in an otherwise substantially secular setting," Hunt v. McNair, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973), recognizes that unless restricted and controlled, Government involvement may advance religiosity even though the institution

with which it is involved is not subsumed in a religious mission.

13. The Pageant, as previously discussed, is not subsumed in a religious mission, but it cannot be ignored that the religious symbol contained in the Pageant can have a religious effect, and the degree of this effect can vary according to how it is utilized. In turn, the effect of the Government's involvement therewith can vary according to the restrictions and controls placed thereon. A balancing of all of these factors determines if the effect of the Government's involvement

that balancing test which determines whether the Government involvement has more than a "remote and incidental effect beneficial to religious institutions."

We do not agree with Judge Leventhal that the Supreme Court's admonishment in Levitt v. Committee for Public Education and Religious Liberty, 413 U.S. 472, 480, 93 S.Ct. 2814, 2819, 37 L.Ed.2d 5091 (1973), that "the State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination," can somehow work to procedurally change the burden of proof as to the ultimate effect of the Government's involvement once the appellant has offered evidence that the creche is a patently religious symbol.[14] The relevance of our disagreement on that factor is minimal, however, for *de novo* review of the record convinces us that the evidence clearly shows, when considering the nature of the Government's involvement and the overall effect of the creche, that the Government's involvement is constitutionally permissible.

We do not dispute that the creche is an obvious religious symbol, nor do we consider lightly the testimony of plaintiff's witnesses concerning its effect upon them. Yet when we engage in the inevitable "line drawing" that this and other First Amendment problems require, *see* United States v. 12 200-Ft. Reels of Super 8mm. Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), we do not find the Government's involvement constitutionally infirm. In reaching such a conclusion we are particularly impressed by the following factors: (1) the secularized nature of the Pageant and, to a certain degree, of the Christmas holiday season itself; (2) the utilization of the creche only to manifest the religious heritage aspect of the Christmas celebration, as only one of many "traditional aspects of our national history associated with Christmas"; (3) the presence of explanatory plaques on the grounds of the Pageant which state, *inter alia*:

The National Park Service sponsors the Pageant on the basis that this National Celebration Event is wholly sec-

---

is more than remotely or incidentally beneficial to religious institutions.

The creche as used in the Pageant is not *supposed* to have a sectarian effect in the sense of advancing any religious belief. The reality of the situation—considering its status as a Christian religious symbol—leaves open for debate whether its use is susceptible to misinterpretation, and the Government's involvement looked upon as an imprimatur of the belief that it symbolizes.

14. In addition to the *Levitt* reference, Judge Leventhal draws support for his burden-shifting theory from Mr. Chief Justice Burger's statement in Lemon v. Kurtzman, 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed. 2d 745 (1971), that the State legislatures created statutory restrictions designed to guarantee that the State financial aid supported only the secular educational function "in candid recognition that these programs approached, even if they did not intrude upon, the forbidden areas under the Religion Clauses." Our prior opinion noted that "[p]erhaps an appropriate accompanying plaque, rather than a mere explanation in pamphlets with lesser circulation, might serve . . . to allay the impression

of Government sponsorship of religious belief . . . ." Allen v. Hickel, 138 U. S.App.D.C. 31, 424 F.2d 944, 949 (1970). We look upon such remarks as indicating only that the Government must recognize its burden to separate out the secular from sectarian when it becomes involved in activities that purportedly raise First Amendment difficulties. This it is constitutionally required to do. Yet, the appellant bears the procedural burden of showing that the Government has failed in its constitutional obligations. *See, e. g.,* Hunt v. McNair, 413 U.S. 734, 746, n.8, 93 S.Ct. 2868, 2876, 37 L.Ed.2d 923 (1973), and Tilton v. Richardson, 403 U. S. 672, 681–682, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), where the plaintiffs' failure to introduce sufficient evidence to convince the Court that the religious and secular educational functions of Church-related institutions were inseparable resulted in a failure on its part to carry the burden of proving that a primary effect of the Government's involvement advanced religion. Thus, although it is the Government's obligation to comply with the mandates of the First Amendment it is the plaintiff's burden to prove that the Government has failed in this obligation.

ular in character, purpose, and main effect. The illuminated creche display is intended to be reverential to the religious heritage aspect of Christmas; but that display is not meant, and should not be taken, either to promote religious worship, or profane the symbols of any religion;

(4) the fact that the Government involvement is limited to the non-creche aspects of the Pageant, and apparently is similar in kind to that regularly supplied by the Government to other national celebration events; and finally, (5) the fact that the creche should not be considered in isolation but as an integral part of the whole of the Pageant, and that the question with which this court is faced is not whether the creche, considered in isolation, has a religious effect, but whether the Government's limited involvement in the Pageant—an admittedly secular event whose only "religious" content is that it recognizes the religious heritage aspect of Christmas by means of an admittedly religious symbol—has more than a "remote and incidental" effect advantageous to religion.

### III. Excessive Entanglement

■ In Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L. Ed.2d 697 (1970), a decision upholding the constitutionality of property tax exemptions for religious organizations, the Supreme Court enunciated an "excessive entanglement" approach to First Amendment questions. The Court noted that "the policy of neutrality" required by the First Amendment "seeks to minimize" a kind of "day-to-day" relationship between Church and government, and that the policy of tax exemptions for Church property was enhanced because it furthered the desired insulation

and separation between the two. One year later in *Lemon, supra,* the Court elaborated on the approach and, in what has been described as a "doctrinal departure," treated it as a distinct third test to be considered apart from either the purpose or primary effect tests.[15] *Lemon,* basically dealt with aid to parochial elementary and secondary schools in the form of salary supplements for teachers. The Court noted, 403 U.S. at 619, 91 S.Ct. at 2114, that the religious permeation in the schools was of such a degree that "[a] comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that [the] restrictions [implemented to prevent the funds from being used for religious purposes] are obeyed and the First Amendment otherwise respected." Noting that "we cannot ignore here the danger that pervasive modern governmental power will ultimately intrude on religion and thus conflict with the Religion Clauses," 403 U. S. at 620, 91 S.Ct. at 2115, the Court concluded that the prophylatic administrative contacts required would "involve excessive and enduring entanglement between state and church." 403 U.S. at 619, 91 S.Ct. at 2114. Importantly, *Lemon* also recognized a second branch of the entanglement test, the possibility that such Governmental action will result in intensified "[p]olitical fragmentation and divisiveness on religious lines" because of "the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow." 403 U.S. at 623, 91 S.Ct. at 2116. The entanglement test is thus concerned with both administrative and political ramifications of Government involvement, and is geared to minimize interference, monitoring, and any divisive impact among the people.[16]

15. *See* Note, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 1, 168 (1971).

16. *See id.* at 172–73:
The important factors now excluded from the effect criterion—the impact of the legislation on "voluntarism in matters of religion, mutual abstention of the political

and religious caretakers, and governmental neutrality toward religion and between religion and non-religion" [*see* Freund, Public Aid to Parochial Schools, 82 Harv.L. Rev. 1680, 1684 (1969)]—are considered during the course of the separate inquiry into entanglement. (Footnote omitted.)

While the contacts and conflicts inherent in the Government's position on various committees of the Christmas Pageant of Peace, Inc. amount to considerably less than involvement in the everyday working affairs of a religious institution, and considerably less than the constant surveillance and interference discussed in *Lemon*, we must agree with Judge Leventhal that the membership of government officials on various of the committees presents entanglement difficulties.

■ Again, the involvement we consider here today is novel in terms of Supreme Court precedent and thus does not fit well in the pigeonholes of past decisions. The test, however, emanates from the principle that Government involvement with religion should be kept to a necessary minimum, and that there should be avoided not only the actual interference but also the potential for and appearance of interference with religion. Judge Leventhal has enumerated instances where Government officials have been placed in (at best) awkward positions because of the conflict between their roles as representatives of the Government and decision makers on the planning and other committees. Although the officials involved have maintained an admirable "even keel" and desire for fairness in dealing with the sensitive matters thrust upon them, in view of the limited purpose such membership serves and the goal of minimal contacts, and considering the conflicts of the past, possibility for conflicts in the future, and inferences some may draw from the Government membership, this type of activity should not be engaged in by representatives of the Government and is constitutionally prohibited by the First Amendment.[17]

■ Although the Government could completely put an end to any semblance

of entanglement by terminating its role in the Pageant, we cannot conclude that such action is constitutionally required. When the Government disassociates itself from membership on various committees its involvement can be limited to nominal co-sponsorship in terms of labor and equipment provided for the construction and disassembly of the non-creche aspects of the Pageant. The administrative contacts would be minimal —certainly no greater than those found proper in *Tilton* and *Hunt*—for there need be only so much as is necessary to assure that the labor and equipment provided is not utilized for the creche. Political divisiveness would be minimal (especially in view of the regulations that we require to assure continued neutrality), and although continuing on a yearly basis the involvement would not be subject to pressures for increased aid by way of continuing appropriations of the nature involved in *Lemon* and *Nyquist*.

The Supreme Court has in the past been influenced, either when considering involvement from the standpoint of entanglement or primary effect, by the "neutrality" of a specific Governmental action. Thus, in *Walz* Mr. Justice Harlan in his separate opinion noted that "noninvolvement is further assured by the neutrality and breadth of the exemption," 397 U.S. at 698, 90 S.Ct. at 1426, and in *Nyquist* Mr. Justice Powell, when discussing the effect of Governmental involvement, noted, 413 U.S. at 782, 93 S.Ct. at 2970 n. 38:

> *Allen* and *Everson* differ from the present case in a second important respect. In both cases the class of beneficiaries included *all* school children, those in public as well as those in private schools. See also *Tilton v. Richardson, supra*, in which federal aid was made available to *all* institutions

---

17. Although the creche "is exclusively the property of the Christmas Pageant of Peace, Inc." and all activities regarding storage, maintenance, repair, erection and disassembly of the creche is "the responsibility of the non-Federal membership of the Pageant

of Peace Committee," *See* Def. Ex. 1, para. 5, attachments E and F, discontinuance of membership on these committees will further insulate the Government from conflict producing situations regarding the creche.

of higher learning, and Walz v. Tax Commission, *supra*, in which tax exemptions were accorded, to *all* educational and charitable nonprofit institutions.

We deeply respect and adhere to Mr. Justice Douglas' admonition in Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952) that "[t]he government must be neutral when it comes to competition between sects," but we find no evidence that neutrality is violated here. The unrefuted evidence in the record is that the Government's involvement with the Pageant is similar to the cooperation it provides "to other private organizations which sponsor the production of officially recognized national celebration events, such as the Cherry Blossom Festival, the President's Cup Regatta, the National Independence (Fourth of July) Celebration." This cooperation is based on a desire to further the secularized themes of these events, booster tourism, and best utilize the "park areas in the very recreational aspects to which Congress has directed their primary dedication." *See* 16 U.S. C. §§ 1, 20–20g (1970). There has been no showing that the selection of the Pageant of Peace (which attracts nearly a half-million visitors a year[18]) as an event to support is based upon any other purpose, nor that it has any other primary effect. To assure that this neutrality continues and is not the subject of continuing controversy, we require that if the Government desires to continue its support of the Pageant it must promulgate regulations governing such involvement, as set out in the Court's Per Curiam opinion.[19]

Accordingly, we remand the case to the District Court for proper disposition in accordance with the Per Curiam opinion.

LEVENTHAL, Circuit Judge, concurring:

Residents of the metropolitan area of the District of Columbia brought an action for injunctive and declaratory relief against the Secretary of the Interior and subordinate officers of the National

18. *See* Pl.Ex. 38.

19. Mr. Justice Harlan discussed his theory of what "neutrality" requires in Walz v. Tax Commission, 397 U.S. 664, 696, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970). (Harlan, J., concurring):

Neutrality in its application requires an equal protection mode of analysis. The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders. In any particular case the critical question is· whether the circumference of legislation encircles a ·class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter.

The Pageant of Peace, while certainly not a religious institution, is an event which "fall[s] within the natural perimeter" of those activities to which the Government has in the past rendered support of one kind or another. It is a major tourist attraction which enhances business in the District, utilizes Park land in a recreational sense, and fosters a principle—this nation's desire for peace and understanding—with which the Government can indeed associate itself. These "neutral principles" govern the Government's involvement, and we cannot find in the record evidence to convince us that the one religious aspect of the Pageant gives an unwarranted and unconstitutional effect to that involvement.

Absolute neutrality is different from constitutional neutrality, and thus statements that the Government is not "absolutely" neutral—in that here it co-sponsors an event with a Christian religious symbol while it does not co-sponsor one with a non-Christian or, to the extent possible, a non-secular symbol—do not move me to automatically conclude that its action is constitutionally defective. The primary effect test itself is proof of such a distinction, for an action of the Government not "absolutely" neutral between religions or between religions and non-religion is not automatically unconstitutional—it is subject to scrutiny to determine if this lack of "absolute" neutrality has more than a remote and incidental effect beneficial to a religious organization. As Mr. Justice Douglas noted in Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952): "A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: 'God save the United States and this Honorable Court.'" Indeed, such a statement is not absolutely neutral, yet is it constitutionally defective?

Park Services, challenging the government's sponsorship of the Christmas Pageant of Peace held annually on the Ellipse, a park adjacent to the White House, as a violation of the Establishment Clause. More particularly, the plaintiffs challenge the inclusion in the exhibits of the Pageant of a creche depicting the Nativity Scene.

Violations of the Establishment Clause arise when governmental activity has a non-secular purpose, Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), or has an effect of "substantial religious impact", School District of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), or leads to excessive entanglement with religion, Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

On the entanglement issue I agree with the other members of the panel that the participation of the Government officials in the committee structure and decision making of the Christmas Pageant of Peace violates the "entanglement" test. The views set forth on that subject in this opinion, like the discussion of factual background, are in essence incorporated by reference in the majority opinion filed for the court by Judge Tamm. As to purpose and effect, the majority find that there are no constitutional problems once the entanglement problem is removed. On the purpose test, although I share the views of the majority in good measure, there are some questions that are not resolved to my satisfaction, and which I would defer pending developments on the dis-entanglement. On the issue of effect, I have even greater questions, due to my disagreement with the approach of the District Court in certain respects, but on these matters my views apparently diverge from those of my brethren.

With that extended prefatory note, this opinion will proceed in more conventional manner, beginning with presentation of the prior proceedings and basic facts concerning the Pageant, continuing with views on the entanglement, purpose and effect issues, and concluding with comments on the problem of disposition and relief.

## I. PRIOR PROCEEDINGS, AND DISTRICT COURT'S FINDINGS

In a prior stage of this litigation, this court held that appellants have standing to sue as residents of the metropolitan area of the District of Columbia served by the park lands involved in this dispute. Allen v. Hickel, 138 U.S.App.D.C. 31, 34, 424 F.2d 944, 947 (1970). The Court also held that the record was too incomplete for making a finding under School District of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) as to whether the primary effect of the creche constituted "substantial religious impact". We also left room for further factual development as to the purpose of government sponsorship of the Pageant.

In remanding the case to the district court, this court indicated its concern that the creche be presented in a manner "designed to obviate or at least minimize offense to the sensibilities" of citizens who did not believe in the religious message advanced by the creche or who might find the very display a profanation of their own beliefs. We suggested the possibility that an appropriate accompanying plaque might be able to allay the impression of Government sponsorship and set the proper tone in the representation.

On remand, the district court, in a memorandum opinion of Judge Pratt, issued on November 3, 1971,[1] held as to the purpose and primary effect tests of *Abington*, that there was neither a religious purpose in the Government's sponsorship of the Pageant, nor was the primary effect of the creche that of substantial religious impact.

On the question of purpose, Judge Pratt found it to be secular, since the Pageant was intended "to provide a col-

1. 333 F.Supp. 1088 (D.D.C.1971).

orful ‚event during the Christmas season which would attract visitors to Washington and thereby increase the business of local merchants." [2]

As to effect, Judge Pratt accepted the premise, substantiated by unanimous testimony, that the Nativity Scene is a religious symbol. John Wogaman, an ordained Methodist minister, and a professor of Christian ethics at Wesley Theological Seminary in Washington, testified that the creche "has a deeply religious significance." [3] E. James Lieberman, a practicing psychiatrist and Professor of Psychiatry, Howard University School of Medicine, put it this way: "The creche is a symbol, I think a very powerful symbol of the predominant religion or group of religions in our society." [4]

The conclusion as to religious symbolism was shared by witnesses called by the Government. Reverend James G. Kalaris, a member of the Program Committee of the Pageant, believed that "having the Nativity Scene at the Pageant of Peace is celebrating the birth of Christ." [5] Father Joseph Corbett, the Roman Catholic representative on the Program Committee, stated that, as a priest, he considered the Nativity Scene a "basic and central religious symbol" [6] and that for him the commemoration of the birth of Christ was the "central core" of the Pageant. [7]

Based on this record, the District Court observed that "the dominant theme running through most of the testimony was that the creche is a religious symbol" [8] and concluded that "It cannot be gainsaid that the Nativity scene, portraying as it does the birth of Christ, has religious significance . . . . " [9]

The impact of the creche, although a clear religious symbol, was diminished, Judge Pratt concluded, by the secular setting of the Pageant as a whole. Moreover, the court indicated that plaques installed by the Government subsequent to this Court's remand order played a central role in obviating any possible "government stamp of approval" affixed to the creche display. [10]

The court also held that a third test, formulated in Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), after our first decision in this case, [11] that "excessive government entanglement" not be present, was also satisfied.

For reasons which follow, the *de novo* review of the record, which the First Amendment requires, [12] leads to a finding by all members of the court that although the purpose of Government involvement was not to promote religion, Government sponsorship and participation in the Pageant and in the decision of matters relating to the creche, constituted "excessive entanglement" with religious matters in violation of the Establishment clause.

## II. DESCRIPTION OF THE CRECHE AND PAGEANT

### A. *Physical Layout of Pageant*

At the evidentiary hearing, uncontroverted testimony established the physical layout of the Pageant of Peace. [13] The

---

2. 333 F.Supp. at 1092.

3. Tr. 98–99. Reverend Wogaman further testified:
   to describe . . . the creche scene as wholly secular, or to imply that it is wholly secular, I find offensive as a Christian, because I don't regard a depiction of this kind of scene of the birth of Jesus' Christ as being wholly secular.

4. *Id.* at 235.

5. Id. at 595–596.

6. *Id.* at 612.

7. *Id.* at 611–612.

8. 333 F.Supp. at 1093.

9. *Id.*

10. *Id.* at 1096–1097.

11. Our opinion in Allen v. Hickel, 138 U.S. App.D.C. 31, 424 F.2d 944, issued April 10, 1970, and *Walz* was decided on May 4, 1970.

12. New York Times v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

13. Testimony of Theodore T. Smith, Chief, Division of Special Events with the National

Pageant is held in the Ellipse adjacent to the White House. Ellipse Street, which runs parallel to E Street marks the northern boundary of the display. Two boardwalks called the Pathways of Peace, running south from Ellipse Street, are the principal means of entry to the Pageant. These boardwalks lead to the center of the Ellipse, where the large National Christmas Tree, which is lit by the President in the opening ceremony, provides a colorful centerpiece. Three spokes, besides those of the Pathways of Peace, depart from the Tree and serve as pedestrian routes to the other exhibits.

Directly east of the Tree is a stage where various cultural and musical events are held during the period of the Pageant. To the south is a reindeer pen and a yule log and fire area. The creche containing the Nativity scene lies directly west. Access to the creche is not restricted to the spoke running westward from the Tree. It can be reached from the reindeer pen by a walkway, or from any point and direction when, weather permitting, people walk on the grass instead of the boardwalks.

The creche itself contains the traditional Nativity scene; Mary and Joseph are seen kneeling over the Christ child in a crib with the Magi, shepherds and animals in attendance.[14] The depiction is life size and illuminated at night.

### B. *Theme*

In 1970, the last year for which there is evidence in the record, the Pageant formally began on December 16, when the President participated in the lighting of the National Christmas Tree. Typically, the opening ceremony also consists of presentations of various singing groups, speeches of government officials, and religious messages in keeping with the meaning of Christmas. After the opening, the Pageant contin-

ues to feature groups presenting a selection of traditional Christmas music, but the heart of the attraction is the various exhibits which the residents and tourists in Washington can see by touring the grounds of the Ellipse. The creche, of course, is one of these exhibits.

### C. *The Plaques*

Following the suggestion in our earlier opinion, the sponsors of the Pageant placed three plaques entitled "The Story of the Christmas Pageant of Peace" at locations within the Ellipse.[15] Two of these plaques were placed at the entries of the north-south boardwalks. The third was put along the boardwalk running from the National Tree to the creche. The latter plaque was 110 feet from the creche.[16]

These plaques contain an extensive amount of text about the history of the Pageant, its attractions and themes. In the eighth paragraph there appears the following statement:

> The National Park Service sponsors the Pageant on the basis that this National Celebration Event is wholly secular in character, purpose and main effect. The illuminated creche display is intended to be reverential to the religious heritage aspect of Christmas; but that display is not meant, and should not be taken, either to promote religious worship, or profane the symbols of any religion.

## III. THE ENTANGLEMENT ISSUE

### A. *The Pertinent Facts of Record*

The Christmas Pageant of Peace, Inc. was first organized in 1954. Before that time government involvement with the celebration of Christmas consisted of a presentation to the President of the National Community Christmas Tree, a practice which originated with President Calvin Coolidge in 1923. Originally, this tree was erected in the Ellipse,

---

Capital Parks, National Park Service, Department of Interior, Tr. at 363–369.

14. Tr. at 26; Pl. Exhibits 1b and 1d.

15. The entire text of the plaques can be found in the opinion of the district court, 333 F.Supp. at 1095–1096 n.6.

16. Affidavit of Reverend Allen at 1.

where it is today. In 1934, however, the presentation ceremonies were transferred to Lafayette Park. In 1939, the event was again moved to the Ellipse. In the 1941–1954 period, the presentation program was conducted on the Executive Mansion grounds.[17]

From its inception, the Pageant was directed by a coalition of three groups: government, business and clergy. The government played a pivotal role, through the person of Edward J. Kelley, who was Superintendent of the National Park Service when the Pageant was organized in 1954. Kelley was one of the original incorporators, General Chairman of the Executive Committee, Director, and First Vice-President of the Pageant.[18] Business leaders associated with the Washington Board of Trade also played a central role. Three prominent members were incorporators, officers and directors of the Pageant: Edward R. Carr, President, Edward M. Kirby, Second Vice-President, and Clarence A. Arata, Secretary.[19]

The Washington area Christian clergy were represented in the original organization of the Pageant through the Archbishop of Washington and the Executive Secretary of the Washington Federation of Churches, two of the "official sponsoring organizations".[20] Other clergymen from the Archdiocese and the Washington Federation of Churches

served as co-chairmen of the "Committee for Religious Cooperation." [21]

The organizational structure of the Pageant has not changed much since 1954. The 1970 chart, the latest in the record, shows government officials holding two of the five positions on the Executive Committee,[22] and Theodore T. Smith of the National Capital Region, U.S. Park Service, was a member of the Program Committee and Chairman of the Grounds and Facilities Committee.

The prominence of the church, at least in the sensitive Program Committee, was reflected in its strong participation through Rev. Msgr. D. Joseph Corbett of the Archdiocese of Washington, Rev. Demetrios G. Kalaris of Sts. Constantine and Helen Greek Orthodox Church, and Rev. John T. Tavlarides, of St. Sophia Greek Orthodox Cathedral. These members of the 1970 Program Committee worked side by side with the government members, Theodore Smith and Clinton C. Price of the D.C. Recreation Department.[23]

The sponsorship of the government is highlighted in the annual printed program of the Pageant,[24] and even in the plaques which were intended to minimize this relationship. At the end of the text on the plaque, the following appears: "Dedicated by the Pageant Sponsors, Christmas Pageant of Peace, Inc. & National Park Service, U.S. Department of the Interior."

17. Pl. Exhibit 43, Press Release, U. S. Department of the Interior, National Park Service, National Capital Parks, November 13, 1958.

18. Def. Exhibit 30, The Christmas Pageant of Peace, First Annual Report; Def. Exhibit 25, Certificate of Incorporation of "Christmas Pageant of Peace, Inc.", filed December 8, 1954. The Executive Committee of the Pageant, contained other members of the government, as well: Vice Chairmen, Milo F. Christiansen (D.C. Recreation Department) and T. Sutton Jett, (Office of National Capital Parks, Executive Secretary); Clinton C. Price, D. C. Recreation Department. In addition, many members of government served on "The Honorary Committee", or as "Participating Agencies Represented".

19. Id.

20. Pl. Exhibit 23, Report of Operations and Recommendations for 1955, Christmas Pageant of Peace, from Edward M. Kirby, Program Chairman, to the Board of Directors, February 21, 1955.

21. Pl. Exhibit 4, Christmas Pageant of Peace, Organization Chart, 1955.

22. These positions were held by T. Sutton Jett, Office of National Capital Parks, and Edward P. Cliff, Forest Service, U. S. Department of Agriculture.

23. The information on the 1970 organizational structure is taken from Pl. Exhibit 2, the 1970 Christmas Pageant of Peace brochure.

24. Id.

The entanglement of the government and organized religion was not confined to the formalism of an organizational chart. The organization of the Pageant required a complicated, and almost inescapable, set of actions and decisions by the government officials involved on religious matters: Guidelines on the organization's principles had to be approved; speeches promoting the Pageant had to be made; conflicting views as to the prominence of the religious motif compromised or placated, and money or services donated to finance the Pageant's activities.

In 1956 "basic principles" were privately agreed upon, by sponsors including the D.C. Recreation Board, for the organization of the Pageant.[25] The two "basic concepts" were as follows:

1. That the Christmas Pageant of Peace must adhere to the *principle* of the Christian concept of Christmas—the celebration of Christ's birthday.

2. That the Christian concept must be maintained throughout the Pageant *programs* and the Pageant exhibits. (emphasis in original)

The important point here is not whether the government shared these beliefs. In fact, government officials seemed to have been greatly troubled by the adoption of these principles.[26] What is of concern is that government officials were called on by virtue of their office to participate in the decision of such questions.

The Department of the Interior, which through its jurisdiction of the National Parks was the agency of government most heavily involved with the planning of the event, made available its facilities to publicize the event. While these releases dwelled principally on secular themes, the religious message, and particularly the inspiration provided by the Nativity Scene,[27] was identified, if only to accommodate the desires of the religious leaders participating in the event. This planning and publicity activity of government officials occasions more concern than remarks of officials, such as the Secretary of the Interior, at Pageant ceremonies, since there is latitude in such remarks for purely personal observations. Still the problem exists that the Secretary of the Interior, at least on one occasion, may have been led by assistants who planned the event, and their awareness of the intense interests of the clerical members of the executive group, to draw attention to the "reproduction of the nativity scene, so treasured in this season and in the life of all Christian communities."[28]

The role that the Government officials played in the Pageant also required them to be involved with allocating

25. Pl. Exhibit 25, Memorandum from Harry T. Thompson, Acting Superintendent, to Henry Gichner, Chairman, D.C. Recreation Board, November 7, 1956.

26. In the Memorandum cited *supra* note 25, Mr. Thompson, in discussing his problem with agreeing to the Basic Principles, put the matter this way:

Mr. Milo F. Christiansen has outlined to me the concern expressed by certain Members of the Board during a consideration of the recent announcement set forth as a guide in conducting the program for the 1956 Pageant of Peace.

I, too, as an acting Member of the Recreation Board and Pageant of Peace Committee, am concerned that all facets of the program as now envisioned may not be in keeping with what I personally would have preferred. Nevertheless, and in spite of

my personal concern, I feel that the overall benefits outweigh my personal views and that full participation of all persons and agencies concerned is essential to its success.

27. "The Nativity Scene offers life-sized inspiration for the attending crowds." Pls. Exhibits 43 and 67, Press Releases of the U. S. Department of Interior, National Park Service, National Capital Parks, November 13, 1958 and November 20, 1959.

28. Pl. Exhibit 28 at 3. Speech of Secretary of the Interior Seaton, December 20, 1956. The Secretary went on to say:

During the days to come, as we light the trees in our own home, we will know that men everywhere are reminded of a night long ago when the Infant Prince of Peace lay in a manger in far off Bethlehem. . . .

space and time to various religious groups who wished to participate in the event. Before discussing the questions that arose as to the Pageant as such, it may be instructive to take note of the occasion that arose in 1967, when a Jewish citizen proposed that there be displayed on the White House lawn a lighted Menorah—the article that holds the candles in the festival of lights holiday of Chanukah, a Jewish holiday, typically celebrated in December, that provides an occasion for rejoicing and gifts for children. Secretary Udall responded as follows:[29]

> The Menorah has religious significance . . . [D]isplay of a lighted Menorah on the White House grounds could be considered by some as a form of secularization of this religious symbol which could reasonably and properly be criticised. In addition, there is the very serious question under the constitutional provision regarding Federal involvement with a specific religious activity.

Thus the Secretary voiced concern over the propriety and validity of "federal involvement with a specific religious activity" on Government property. Yet the Government officials assigned a major role in planning the Program of the Pageant were involved in program decisions that necessarily made selections among faiths. In 1966 Karl Bennet Justus, Executive Director and editor of The Military Chaplain, applied·for a role as a clergyman in the opening ceremony of the Pageant. He was informed by the General Chairman of the Executive Committee, which included two Government officials: [30]

> [A]t all past pageants, it has been the practice of the committee to invite the two ecclesiastical leaders of the Protestant, Episcopal and Catholic Faiths to present alternately the Invocation and Benediction. Similarly, Archbishop Iakovas of the Greek Orthodox

Archdiocese of North and South America has traditionally been invited to offer a Prayer for Peace during the program.

> We have felt that by calling upon these leaders, the spirit and religious principles of all Christian Faiths have been represented.[31]

Decisions of this kind differ from those pertaining to choices as to who will give a ceremonial invocation at a purely secular event. An added significance is attached because the Government is charged with selecting a group of clerical leaders whose faiths are compatible with the religious message of Christmas. Thus, the Government letter indicates that in its judgment the "religious principles of all Christian Faiths have been represented." At a ceremonial event any religious faith, Christian or non-Christian, is satisfactory and neutrality between faiths is more likely in view of the vast number of ceremonial functions to be performed.

In recent years the Government, partially in response to objections raised by the American Civil Liberties Union, has terminated all financial support for the event which is connected with the creche.[32] However, the Government does continue to defer costs not directly connected with the creche, which include preparing the area to receive a showmobile, setting up the many walks, platforms, deer-yard and building, setting the tree, electrical, painting, carpentry, horticultural activities, and keeping the area and buildings policed for trash. After the event is terminated, the government bears the additional costs of labor, material and equipment used for dismantling and putting the Ellipse area back in the condition it was in before the Pageant. Total costs for these services were $72,789.78 in 1968–69.[33]

These expenses were for the benefit of the Pageant as a whole and all its

---

29. Pl. Exhibit 51 in App. to Brief at 51.

30. Pl. Exhibit 15, The 1966 Christmas Pageant of Peace brochure.

31. Pl. Exhibit 50.

32. Def. Exhibit 1, Attachments F, H1.

33. Def. Exhibit 1, Attachment H2.

parts, including the attraction and servicing of those visiting the creche.

Finally, the record reveals how the Government officials enmeshed in the planning of the Pageant drew on their personal sentiments. It makes no difference whether the official was one whose comments on Pageant materials in effect advocate the centrality of the religious message,[34] or was one who acknowledged a personal opposition to the stress on religion in the Pageant, but felt that "the overall benefits outweigh my personal views and that full participation of all persons and agencies concerned is essential to its [the Pageant's] success." [35]

### B. *Application of Pertinent Principles*

As long as the Government officials participated in the planning and sponsorship of the event, they could not escape religious entanglement, because the inclusion of the creche was a sine qua non of participation by church officials, and their participation in turn, was an essential element of the Pageant. Church leaders like Monsignor Corbett and Father Tavlarides were of the opinion that elimination of the creche would be "another step toward a gradual attempt to abolish the worship of God." [36] If the government was to preserve the event with their participation, their point of view had to be accommodated. Even Mr. Carr, the long-standing President of the Pageant of Peace, who had come to the Pageant through his association with the Washington Board of Trade, took the position that taking the creche out of the Pageant would be like taking Christ out of Christmas.[37]

The "entanglement" test voiced in Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) and Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), issued subsequent to our first review of this case,[38] requires that allegations of violations of the establishment clause be considered in terms of whether Government involvement with religion leads to an "impermissible degree of entanglement." *Walz, supra,* at 675 of 397 U.S., 90 S.Ct. 1409.

*Walz* involved the question of the compatibility with the First Amendment of New York's grant of tax exemption to organizations and associations promoting "moral or mental improvement", which included all churches, as well as a wide range of other organizations.[39]

The Chief Justice began his opinion by declaring " . . . for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." at 668, 90 S.Ct. at 1411. These were the three main evils to be guarded against. *Lemon, supra,* at 612 of 403 U.S., 91 S.Ct. 2105. In concluding that "entanglement" was not present, the Court stressed the neutrality of the involvement and the even greater dangers which could arise from not exempting the churches from taxation. Justice Harlan made clear in his concurring opinion, " . . . noninvolvement is further assured by the neutrality and breadth of the exemption." *Walz, supra,* at 698 of 397 U.S., at 1426 of 90 S.Ct.

---

34. See Pl. Exhibit 32, letter from Cornelius W. Heine, Chief of the Public Use Branch of the National Service, to Dr. Harold M. Dudley November 22, 1957, which reads in part as follows:
    I have been impressed by this photograph taken by Mr. Abbie Rowe for over two years. To me it tells the story and the theme that all of us would like to convey in the Christmas Pageant of Peace—the Shepherds silently watching, awed by the birth of the Prince of Peace—bringing to us the true impact of Christmas.

35. See note 26.

36. Pl. Exhibit 3, Pageant of Peace Meeting to discuss objections made by the American Civil Liberties Union, October 13, 1967.

37. Deposition of Edward Carr, Def. Exhibit 14, pp. 18–19.

38. *See* note 11 *supra.*

39. 397 U.S. at 672, 90 S.Ct. 1409.

The principle of neutrality, to avoid the danger of aiding one religion more than another or the religious more than the secular, is a necessity if a measure is to avoid foundering on the rock of involvement. The forms of financial aid upheld in recent years by the Supreme Court were given to all institutions on a non-discriminatory basis. *See* Everson v. Board of Education, 330 U.S. 1, 67 S. Ct. 504, 91 L.Ed. 711 (1947) (reimbursements to parents of public as well as parochial school children for bus fares in connections with transportation to and from school); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (secular textbooks for all children in grades seven through twelve attending public and nonpublic schools); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L. Ed.2d 790 (1971) (funds for the construction of facilities to be used for clearly secular purposes by public and nonpublic institutions of higher learning). This principle was recently reaffirmed in Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), where the Court held unconstitutional the New York programs for direct "maintenance and repair" aid, tuition reimbursement, and tax deductions for nonpublic schools, because the effect of such aid was to subsidize and advance the religious mission of sectarian schools. Justice Powell's majority opinion made it clear that it was sufficient that this was "an" effect; it was not necessary that this be the "principal or primary effect." 413 U.S. at 783 n. 39, 93 S.Ct. at 2971.

Essential to the result in *Walz* was the fact that "either course, taxation of churches or exemption, occasions some degree of involvement with religion." at 674 of 397 U.S., at 1414 of 90 S.Ct. Church support of the state and government involvement with church affairs, a corollary of tax enforcement, were dangers avoidable by an exemption policy. This fear of administrative intrusion came to the foreground in *Lemon*, which posed the problem of state financial support to non-public schools for the cost of instructional materials, in specified secular subjects. In order to prevent this support from being used by religious schools to promote religion, there would be "A comprehensive, discriminating, and continuing state surveillance . . . required to ensure that these restrictions are obeyed and the First Amendment otherwise respected." at 619 of 403 U.S., at 2114 of 91 S.Ct. These were programs, the Chief Justice stated, quoting from Mr. Justice Harlan's opinion in *Walz*, "whose very nature is apt to entangle the state in details of administration . . . ." at 615, 91 S.Ct. at 2112.

In refusing to grant the injunction sought here, the District Court found no impermissible "entanglement." Our consideration of the documents in the record leads us to a contrary result. The District Court focused, erroneously in our view, on the impact of religious leaders on the event, which was considered to be relatively minor.[40] In contrast, *Walz* emphasized that the broad New York tax exemption did not require the Government to "single[d] out one particular church or religious group or even churches as such". Unlike the "breadth of the exemption" Justice Harlan pointed to in *Walz*, the case before us is marked by a particularization of

40. The District Court took the following position on the participation of the religious leaders:

There is no question that the support of Christian religious leaders of the community was earnestly solicited and that the participation of such clergymen, both in the planning of the Pageant itself and in supplying the so-called "ceremonial amenities" attached to certain of the individual programs comprising the Pageant, was readily obtained. However, it is clear to the Court on the full record that the participation of Christian religious leaders with their obvious and freely expressed religious motivation has always played a minor part in the presentation of the Pageant itself and, more important, has little if anything to do with the original concept and purpose of this event. 333 F.Supp. at 1091.

the religious symbols permitted on Government property.

Neutrality assumes minimal connection. In the case of tax exemptions the exemption carried with it less involvement than would taxing churches. Here, the Government could easily put an end to its "entanglement" by terminating its role in the Pageant, as in *Lemon*. Its present relationship with the Pageant by its "very nature is apt to entangle the state in details of administration." When the dispute arose within the Pageant concerning the role of the creche, the Government officials, committed to participation in the Pageant, had to accept the inclusion of the creche as the price for holding together the coalition of religious, business and government interests.[41] The Government officials are inevitably involved in decisions as to the role of the creche and the publicity about it, decisions that must be made with the consent of all Pageant participants. At present, the Pageant may fairly be described as "quasi-governmental" in character.[42]

The defendant officials cannot fairly avoid this by reference to Hunt v. McNair, 413 U.S. 734–736, 93 S.Ct. 2868, 2871, 37 L.Ed.2d 923 (1973). That case upheld South Carolina's creation of an Authority for a proposed issuance of revenue bonds, the purpose of which was to "assist institutions for higher education in the construction, financing and refinancing of projects." Scrutinizing the potential for entanglement likely to arise out of the use of such funds by a College, which the court did not consider "pervasively sectarian", for capital improvements, the Court was unable to conclude that there was a "realistic likelihood" that the "Authority could become deeply involved in the day-to-day financial and policy decisions of the College." at 2876. In our case, of course, there is no need to estimate potential involvement, since we deal with a full record on this matter, a record that shows actual involvement.

## IV. THE ISSUE OF PURPOSE

The usual inquiry in an Establishment Clause case is whether a challenged statute has a "secular legislative purpose." Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). In this case, however, we are concerned with the results of actions of the Department of Interior in co-sponsoring an event with the private corporation, The Christmas Pageant of Peace. This has two implications: first, in our search for purpose we must abandon the familiar analysis of the intent of a legislature, and instead try to discern the purposes of activities of officials of the Executive Branch, and second, we must evaluate how the purpose of other sponsors of the Event may affect our determination of governmental purpose.

The plaintiffs have drawn our attention to a number of statements made by Department of Interior officials which may be construed as indicating that their particular purpose in holding the Pageant or including the creche may have been religious.[43] On balance, the

---

41. *See* text at note 30 *supra*.

42. See Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 38, 420 F.2d 597, 606 (1969) (Robb, J., dissenting). Although the majority in that case did not feel that this was a ground for distinguishing plaintiffs' right to a permit for use of the Ellipse during the Pageant from uses at some other time where government functions were not being performed, Judge Robb's characterization is nonetheless valid.

43. Pls. Exhibits 28, 32, 62. For example, Edward Kelley, Superintendent of the National Park Service, wrote the following letter about plans for the 1954 Pageant:

> We believe that this Pageant will have deep significance for all religious faiths and that it will be a vital inspiration to American citizens and to the peoples of the world. Although plans have not been officially released, we may now reveal the endorsement and support of the Washington Federation of Churches, representing the Protestant groups, and the Archdiocese of Washington, representing the Roman Catholics for a three-week pageant sponsored by the Greater National Capital

members of this Court agree that these statements should be held analogous to statements of legislators which may indicate "motives" but do not present the "natural and reasonable effect" of Executive Branch activity. *See* Palmer v. Thompson, 403 U.S. 217, 224–226, 91 S. Ct. 1940, 29 L.Ed.2d 438 (1971). Use of informal statements to show purpose appears to us even more treacherous an undertaking than in the legislative context. The Christmas Pageant of Peace has been ongoing since 1954, and various officials have made their entrances and exits. Thus, purposes and "motives" may have changed over time, a problem not at issue in ascertaining the purpose of a single legislative enactment.

Turning to more objective indication of purpose, the Pageant as a whole puts its main stress on Peace, and it is fair to conclude that it is probably with this goal that the Government has participated.[44] Although the plaques may have to be discounted, as plaintiffs claim, because written in light of this litigation, their message announcing the purpose of Peace is one that has been continually repeated in the official programs of the Pageant.[45]

Moving on to the purposes of the private sponsors of the event, it appears that religious leaders on the Board of the Pageant have insisted that the creche and its religious message be included within the Pageant.[46] Also officers of the Pageant not representing religious organizations, such as Edward Carr, the President, have made clear that preservation of the religious aspect of Christmas is an important part of the event.[47] True, the Pageant was sparked by the quest for a Winter Event to attract visitors and business to Washington.[48] But once this was crystallized in the concept of the Christmas Pageant of Peace, the business leaders accepted, and indeed promoted, the theme of a religious event as a necessary ingredient of substantial significance.

If the issue of purpose were decisive, it would be necessary to assess the significance of the objectives of the private sponsors to be combined project. In the one sense the Government lends approval to their purposes by co-sponsoring the Event, even if the Government's own purpose is solely to promote peace. On balance, it does not appear necessary in this case to resolve the difficult constitutional issue of "purpose," [49] especially

---

Committee, and other civic, non-political, non-sectarian groups.

The location of the Pageant, the Ellipse, directly adjacent to the White House grounds, we believe to be ideal. In addition to plans for religious scenes and pageantry of significance, we hope to dramatize the scene by erecting a high Christmas tree in the center of the Ellipse. Pl. Exhibit 62.

44. *See* Speech of Secretary of the Interior, Stuart L. Udall, at opening ceremony of 1967 Pageant, Pl. Exhibit 48.

45. *See e. g.*, 1970 Program, Pl. Exhibit 2.

46. Pl. Exhibit 20.

47. *See* Deposition of Edward Carr, Def. Exhibit 14, pp. 18–19.

48. Tr. at 545.

49. The difficulties in ascertaining purpose have beleaguered state courts considering related questions. In Lowe v. City of Eugene, 254 Or. 518, 459 P.2d 222 (1969) (adopting on rehearing, the dissent of Goodwin, J. in

original hearing, see 451 P.2d 117 at 124) aff'd on further rehearing, 463 P.2d 360 (1969), the Oregon Supreme Court held that the city of Eugene's issuance of a building permit to erect a permanent cross on city property was a violation of the state constitution. Part of the rationale for the decision was that the City Council had approved issuing the permit for religious reasons. In Paul v. Dade County, 202 So.2d 833, 835 (Fla.Ct.App.1967), cert. denied, 207 So.2d 690 (Fla.), cert. denied, 390 U.S. 1041, 88 S.Ct. 1636, 20 L.Ed.2d 304 (1968), the court held that Dade County could put a lighted cross on the county courthouse during the month of December. The court focused on the purpose of the government in using the cross and concluded that the state constitution was not violated because no public funds were expended. Both state courts limited their opinions to discussion of state constitutional provisions not identical to the First Amendment Establishment Clause. *See also* Meyer v. Oklahoma City, 496 P.2d 789, 792–793 (Okl.1972), cert. denied, 409 U.S. 980, 93 S.Ct. 314, 34 L.Ed.2d 244

since salient considerations have emerged more clearly in our consideration of the "entanglement" standard.

## V. THE ISSUE OF EFFECT

In judging whether the activity of the Government has a "substantial religious impact" in advancing religion, under the standard of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), two questions must be asked. First, is the state aid, in the form of sponsorship and management, as well as funds, given to an institution or event of such a nature that "a substantial portion of its functions are subsumed in the religious mission"? If so, can the state involvement be successfully cut off from the religious aspect of the event to avoid "substantial religious impact?" Thus, the Supreme Court has upheld forms of state aid going to colleges, Hunt v. McNair and *Tilton, supra,* whose functions in substantial part, were not subsumed in a religious mission, and where religious institutions were clearly involved, has allowed types of aid, such as textbooks and transportation where "aid may be channelled to the secular without providing direct aid to the sectarian." *Nyquist, supra,* 413 U.S. at 775, 93 S.Ct. at 2967. In order to evaluate the nature of the event at issue here, some historical perspective is in order.

In November, 1954, at a time when it had been the practice to limit the official celebration of Christmas to the National Christmas Tree on White House grounds, the Special Committee on the Christmas Program, chaired by Mr. Kelley of the National Park Service, reported to the D.C. Recreation Board that the Christmas event was to be expanded and moved to the Ellipse. The Report stated: "The program will follow somewhat the usual pattern, with the exception that it is being moved to the Ellipse to permit installation of a Nativity Scene, of life-size characters . . ." [50] The creche was not only the reason for moving the ceremony to the Ellipse, but it was identified as part of the "backbone" of the Pageant,[51] even though the "principal attraction" [52] was the National Christmas Tree.

On the basis of the record,[53] it is plain that a depiction of the Nativity scene is primarily of religious significance and constitutes a "clear religious symbol." It cannot fairly be put as a mere historical event. As one witness said, when asked to compare the birth of Jesus with that of George Washington, "it would be difficult to parallel the two, simply because Jesus is looked upon as being divine, His birth was that of a virgin. The creche scene depicts the actual event, the occasion of His virgin birth, which makes it quite unique and quite distinctive from the birth of George Washington . . . ." [54]

In my view, appellant has carried its burden of showing that, for the Pageant, "a substantial portion of its functions are subsumed in the religious mission." *See* Hunt v. McNair, *supra,* 413 U.S. at 746 n. 8, 93 S.Ct. at 2876.

Judge Pratt, however, assumed that plaintiffs must not only show that the creche was a clear religious symbol but must also sustain the burden of proof on the issue of whether the creche had a substantial religious effect within the context of the entire Pageant, including the plaques. In my view, this analysis reflected legal error.

(1972) (cross erected on city fair grounds held not to violate state constitution because state money was not being used to support or benefit a particular sect).

50. Pl. Exhibit 35, Committee Report on Christmas Program (letter included in Report).

51. Def. Exhibit 22, Letter from Edward Kirby, Board of Trade, to Mr. Paul Johansen, United Nations Information Office, May 28, 1954.

52. Pl. Exhibit 2, Annual Report, The 1970 Christmas Pageant of Peace.

53. See text at notes 3–7 *supra.*

54. Id. at 153.

In our prior opinion in this case we stated that we could not determine on the record before us whether or not the creche could be presented "in a manner designed to obviate or at least minimize offense to the sensibilities of citizens." 130 U.S.App.D.C. at 36, 424 F.2d at 949. The implications of this kind of Government approach were touched on by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). That case involved state aid to parochial and private schools by means of salary supplements to teachers. Many of the schools involved had obvious religious missions. In order to circumscribe the religious impact of these government funds, the two states involved, Rhode Island and Pennsylvania, attempted to create "statutory restrictions" which required the funds to be used in the teaching of non-religious subjects. The Court noted that "these provisions are precautions taken in candid recognition that these programs approached, even if they did not intrude upon, the forbidden areas under the Religion Clauses." 403 U.S. at 613, 91 S.Ct. at 2111. The Court did not engage in analyzing whether "these legislative precautions restrict the principal or primary effect of the programs" since it resolved the case on entanglement grounds.

The role of such statutory restrictions —or in the case at bar the role of administrative actions taken to dilute religious impact—is made clear by *Nyquist*, where there were no restrictions on maintenance and repair funds, and by Levitt v. Committee for Public Education and Religious Liberty, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 5091 (1973), where the Court invalidated New York's program to reimburse private schools for certain costs of testing and record-keeping. Chief Justice Burger, writing for the majority, stated that "the State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination." This confirms my view that the burden on this issue rests with the State. Al-

though in the instant case some restrictions have been put on the use of funds, in view of the more extensive nature of government involvement, extending to both participation and sponsorship of the event, the Government must bear the burden of showing that its activities or planning of the event have successfully diminished the religious impact of the creche.

In my view, it was the assumption of our prior opinion and the fair implication of the reference in Lemon v. Kurtzman, *supra*, that once the plaintiffs have made a case for a clear religious symbol a presumption operates that this symbol has substantial religious impact. The burden lies on the Government to bring forth evidence rebutting the presumption. In this case, plaintiffs introduced not only testimony that the creche was a clear religious symbol, but also evidence, by way of a poll, to show that the creche had a substantial religious impact on its viewers. The Government raised various methodological questions about the polling procedure, attempting to discredit the sampling, interviewer technique and validity of questions asked to the viewers of the creche. The trial court apparently assumed that if questions as to method left plaintiffs' poll with little weight on the "effect" question, the plaintiffs had not sustained their claim. However, assuming that the poll added nothing to their case, plaintiffs' demonstration that the creche was a clear religious symbol left the Government with the burden, not merely of minimizing plaintiffs' poll, but of making an affirmative showing that the setting of the creche in the Pageant diluted its substantial religious effect.

Three possible reasons were raised by defendants for believing the effect of the creche is diluted: (1) the theme and physical layout of the Pageant do not highlight the creche; (2) the secular nature of Christmas as celebrated diminishes the potential impact; and (3) the plaques make clear to viewers that the creche is to carry no religious message.

While the creche was not at the physical center of the Pageant and played no role in any of the programmed events, the fact remains that large numbers of the visitors to the Pageant have easy access to view the creche. It is a "backbone" of the Pageant even though it is not as prominent as the National Christmas Tree.

In stating that the potential religious impact of the creche was diminished by its secular setting, the District Court stated that:

> [the creche] is seen in department stores, commercial establishments as well as in public places to symbolize the celebration of Christmas, a national holiday. This fact makes it especially difficult to accept the contention that the display of the creche in the Christmas Pageant of Peace has a significant religious impact . . . . (App. at 32).

I find this reasoning unpersuasive. Its unstated premise is that the creche as seen in commercial settings has no substantial religious impact. What seems equally, if not more, likely is that the commercial establishments that display the Nativity scene, a clearly religious symbol, do so in order to invoke its emotional message, as a motivation for purchase of contemporary equivalents of frankincense and myrrh. Whether the commercial establishments are involved in a profanation of religion is not an issue before this court. The claim remains that this is one of the effects of the Government's involvement in the Pageant. Although the use of religious symbols by private enterprise is not of concern to us, the fact that the Government is involved in the Pageant makes the effect of this symbolism a matter for attention under the Establishment clause. The very issue of proof in this case is whether a secular Christmas setting does diminish the religious impact of the creche. On this important point the Government cannot sustain its burden by mere assertion.[55]

Turning to the plaques, which are in evidence, they are, in my view, plainly insufficient to show requisite diminution of religious impact. These plaques do not even seem designed for this purpose. They are entitled "The Story of the Christmas Pageant of Peace" and the statement of secular purpose is buried in the eighth paragraph of a lengthy textual message. One is reminded of a waiver clause tucked away in an insurance policy. In view of this fact and the additional fact that there were only three plaques placed in the Ellipse, only one in any proximity to the creche, there is little reason to believe that their message of secular purpose was read by many viewers or if read had any impact.

The government at trial made objections to the poll that was conducted, on the basis that the pollsters could not be sure that each of the respondents questioned had read the message on the plaques and that, therefore, any results showing that the creche conveyed a religious message were inconclusive.[56] If the Government had committed itself to the design and display of truly effective plaques, this question need never have been asked. Any reliance placed by the trial court on this point seems clearly misplaced. Perhaps a plaque or other means could have been designed to obviate the religious impact of the creche, but the Government did not show that these particular plaques fulfilled that task.

## VI. COMMENTS ON DISPOSITION

The court is unanimous in reversing the judgment of the District Court because of excessive entanglement. The question is as to the decree.

1. No further legal question arises if the sponsors of the event conclude that

---

55. We may also note that it is possible to distinguish between a commercial setting and a Pageant about Christmas. Although it ultimately is an empirical question, it may be that a pure commercial setting does more to vitiate a religious symbol than one supportive of its meaning. Cf. Meyer v. Oklahoma City, *supra* note 39, at 792–793 of 496 P.2d.

56. Tr. vol. 2 at 16.

the creche will be eliminated from the Pageant of Peace.

2. If the non-government sponsors wish to retain the creche, the Government could avoid all Establishment issues by severing its connection with the Pageant and merely treating it like any other applicant for use of parkland.

Department of Interior Regulations provide that upon meeting certain conditions, which the Pageant has met in the past,[57] a permit may be issued. 36 C.F.R. § 50.19 (1972). Under the Regulations there seem to be two types of events, "public gatherings" and "NPS event", § 50.19(a)(1) and (5). An NPS event is defined as "any celebration, commemorative, or recreational event, sponsored or co-sponsored by the National Park Service." Apparently, the permit for the Pageant was issued as an "NPS event." [58]

There is no reason why the regulation cannot be amended—or perhaps the "public gathering" provision interpreted —to authorize an issuance of a permit to the Pageant, in the absence of Government sponsorship and support, assuming non-discriminatory availability of permits to like gatherings. As was stated in Women Strike for Peace (I), *supra*, "[p]arks are a particular kind of community area that, under the Anglo-American tradition, are available, at least to some extent and on a reasonable basis, for groups of citizens concerned with expression of ideas." [59]

It is clear that some parkland, such as Arlington National Cemetery, is already available to religious groups on a non-discriminatory basis. *See* Satiacum v. Laird, 154 U.S.App.D.C. 209, 475 F.2d

320 (1972). If the Government chooses to make other areas available, such as the Ellipse, permits must be granted on the same non-discriminatory basis.[60]

Principles of neutrality and non-discrimination do not require all groups to have access to the same parkland simultaneously. Access to the Ellipse during the holding of the Pageant may reasonably be limited by the Government out of consideration to possibilities of disturbance or interference with the objectives of the participants.[61] *See* Women Strike for Peace v. Morton, 153 U.S.App.D.C. 198, 472 F.2d 1273, 1293–1294 (Wright, J.) and 1299–1303 (Leventhal, J.) (1972).

If the Government proceeds by terminating its supportive relationship with the event, a question arises by reason of the extent to which the government has been associated in the public mind since 1954 with the Pageant. Vestiges of this association cannot be eliminated by simple termination of support both because of the past association and the misinterpretations that might occur in the future as a result of the participation of government officials, in their private capacities, in the event. On remand, the district court will retain jurisdiction of this case pending a decision by the participants as to which option they will take. If the decision is to have the government terminate its relationship with the Pageant, the district court will enter an injunction requiring the government to post a new set of plaques. These plaques should be designed for maximum exposure and readability to the sole purpose of stating that the government in no way sponsors the Pageant of Peace

---

57. Def. Exhibit 1, Attachment E.

58. *Id.* Issuance of permit for event under unspecified regulatory authority. *See* Women Strike for Peace v. Morton, 153 U.S. App.D.C. 198, 472 F.2d 1273 (1972).

59. 137 U.S.App.D.C. 29, 32, 420 F.2d 597, 600 (1969).

60. Women Strike for Peace v. Morton, *supra*.

61. *Also see* Women Strike for Peace v. Hickel, 137 U.S.App.D.C. at 35, 420 F.2d at 603,

"It is not for this or any other court to construct guides for park use. The duty of the court is to assure our citizens that the Park Service has rules, or criteria, or guidelines. These will naturally seek to further park objectives. Yet the Park Service must also take into proper account matters that have at least a non-frivolous constitutional aspect, and must take a hard look at them and give them reflective consideration."

event. This message should not, as is presently the case, be obscured by a lengthy description of the origins and nature of the Pageant.

3. If the creche is retained, and the Government wishes to maintain a connection with the Pageant, the majority is of the view that a connection limited to the financial aid presently provided and/or technical sponsorship would not run afoul of the Establishment clause provided the connection is established in accordance with new regulations grounded in neutral principles and criteria that assure non-discriminatory definition of the events that are afforded any such Government aid or technical sponsorship. As indicated in the footnote to the per curiam statement, while I do not presently discern in what respect such a regulation could run afoul of the Establishment clause, I would prefer to withhold any pronouncement on that issue pending the emergence of the regulations as issued and of a concrete controversy.